**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 1999-DR-01391-SCT**

*KELVIN JORDAN a/k/a KELVIN L. JORDAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/01/1996 |
| TRIAL JUDGE: | HON. ROBERT WALTER BAILEY |
| COURT FROM WHICH APPEALED: | CLARKE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES W. CRAIG |
| | STEFANIE M. McARDLE |
| | F. KEITH BALL |
| | PRO SE |
| DISTRICT ATTORNEY | BILBO MITCHELL |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | LEAVE TO SEEK POST-CONVICTION RELIEF DENIED - 05/19/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.   Kelvin Jordan was convicted by a Clarke County jury of two counts of capital murder in the shooting deaths of Tony Roberts and Codera Bradley, and after a separate hearing, the jury sentenced  Jordan to death.  This Court affirmed Jordan's direct appeal in ***Jordan v. State***, 728 So.2d 1088 (Miss. 1998).  Rehearing was denied, and the United States Supreme Court denied certiorari.  ***Jordan v. Mississippi***, 527 U.S. 1026, 119 S.Ct. 2375, 144 L.Ed.2d 778 (1999).

¶2. Jordan now seeks post-conviction relief pursuant to Miss. Code Ann. §§ 99-39-1 et seq. (Rev. 2000). He raises numerous issues related to his trial and the effectiveness of his attorneys at trial and on appeal. After a full review of the claims raised in the petition, we find that Jordan's petition for post-conviction relief is without merit and should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3. On October 5, 1995, after smoking marijuana and drinking beer outside a Pachuta truck stop, cousins Kelvin Jordan and Frontrell Edwards formulated a plan to rob someone in order to get money to attend a football game. They discussed having to kill the victim so that they would not later be identified. Jordan had a .25 caliber pistol, and Edwards had a .22 pistol.

¶4. Previously that night, Tony Roberts had picked up his two-year-old son Codera Bradley from the child's mother's residence. When Roberts stopped at the truck stop, Edwards asked him for a ride. Roberts agreed, and Jordan and Edwards left with Roberts and the child. After heading south on Highway 35, Roberts stated that he had to work the next morning and he decided that he had driven Jordan and Edwards as far as he could. When he stopped the car, he was shot twice in the head. Codera was later shot in the head. Jordan and Edwards dumped the bodies on a wooded dirt road off the highway.

¶5. Law enforcement officers received an anonymous phone call implicating Edwards and Jordan in the killings. After a search of the trailer where the suspects were staying, officers found a pistol and items thought to have been stolen from Roberts's vehicle. Upon questioning by various officers, Jordan admitted that he and Edwards had robbed and killed Roberts and Bradley. In his statements to police, Jordan blamed Edwards for the shootings. However,

Jordan did confess that he knew about the plan to rob someone, that he suggested to Edwards that they rob Roberts when Roberts pulled into the gas station, that he had a pistol when he left his house that afternoon, that he had fired a shot at Roberts, that he helped Edwards dispose of Roberts's body, and that he helped burn the car and get rid of the pistols.

¶6.     After giving several statements, Jordan took the officers to the location of the bodies. Both victims had been shot in the head. Roberts's car had been stolen, and his pockets had been emptied. Jordan and Edwards had also stolen Roberts's Nike shoes. Jordan had stated that he had brought a .25 caliber pistol with him and that Edwards had a .22 caliber pistol. Edwards and Jordan had also used Roberts's .380 pistol at some point during the crime. Roberts had been shot twice in the head. One wound was a non-fatal shot that passed through Roberts's face. Codera had been shot once in the head. The medical examiner and the State's firearms expert were unable to determine which wounds had been caused by which pistol.

¶7.     Jordan was indicted by a Clarke County jury on two counts of capital murder. He was tried and convicted of both counts, and the jury then considered punishment in a sentencing hearing. After weighing the aggravating and mitigating factors, the jury returned verdicts of death on both counts. Jordan appealed, and the two capital murder convictions and death sentences were affirmed unanimously by this Court. *Jordan v. State*, 728 So.2d 1088 (Miss. 1998).

¶8.     Jordan initially filed a pro se petition for post-conviction relief. In that filing, Jordan made only conclusory allegations without supporting argument. We consider those claims to be subsumed by the later filings made by the attorneys who later entered appearances on behalf

3

of Jordan. In the petition filed by counsel, Jordan raises numerous issues regarding admission of evidence and ineffective assistance of counsel. Counsel for Jordan also filed an amended pleading in which he raised one additional issue as to whether Jordan was mentally retarded pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Finally, in his second amended petition, Jordan raises several new constitutional issues unrelated to issues previously argued. We will consider each issue raised by Jordan.

## DISCUSSION

### I. Psychological Examination in Presence of Law Enforcement

¶9. Jordan first alleges that he was denied his Fifth, Sixth, Eighth, and Fourteenth Amendment rights when Deputy Sheriff Todd Kemp was allowed to testify as to a comment he made during his mental evaluation by Dr. Reginald White. This claim was not raised at trial or on direct appeal to this Court and is, therefore, barred by the provisions of Miss. Code Ann. § 99-39-21(1). This Court has noted that:

> Post-conviction relief is not granted upon facts and issues which could or should have been litigated at trial and on appeal. "The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal." Miss. Code Ann. § 99-39- 21(3) (Supp. 1994). We must caution that other issues which were either presented through direct appeal or could have been presented on direct appeal or at trial are procedurally barred and cannot be relitigated under the guise of poor representation by counsel.

*Foster v. State*, 687 So.2d 1124, 1129 (Miss. 1996). *See also Bishop v. State*, 882 So. 2d 135, 149 (Miss. 2004); *Grayson v. State*, 879 So. 2d 1009, 1020 (Miss. 2004); *Wiley v. State*, 750 So.2d 1193,1208 (Miss. 1999).

4

¶10.    Prior to trial, the defense obtained permission to have Jordan examined by a psychiatric expert.    Dr. Reginald White testified in the sentencing phase that after examining Jordan, he had determined that Jordan appeared to be a person who would be easily influenced or dominated by a stronger person such as Frontrell Edwards.    He also testified that Jordan appeared to have low-average intelligence.    During the State's rebuttal, the State called Deputy Sheriff Todd Kemp who testified that he had transported Jordan to Dr. White's office and that he had been present during Jordan's interview.    Deputy Kemp testified that Jordan had stated during the examination that he had not been influenced by Edwards and that both of them had done what they wanted to do.

¶11.    Jordan now maintains that allowing Deputy Kemp to listen in on the examination violated his constitutional rights. Jordan relies on the U.S. Supreme Court ruling in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), which reversed the death sentence of a capital petitioner after a state psychiatrist testified in rebuttal at the sentencing hearing regarding comments made to him by the petitioner during a court-ordered competency evaluation.  There the Court stated:

> The Court has held that "the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *In re Gault*, 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967).  In this case, the ultimate penalty of death was a potential consequence of what respondent told the examining psychiatrist. Just as the Fifth Amendment prevents a criminal defendant from being made "'the deluded instrument of his own conviction,'" *Culombe v. Connecticut*, 367 U.S. 568, 581, 81 S.Ct. 1860, 1867, 6 L.Ed.2d 1037 (1961)( quoting 2 Hawkins, Pleas of the Crown 595 (8th ed. 1824)), it protects him as well from being made the "deluded instrument" of his own execution.

5

451 U.S. at 462. *Estelle* is distinguishable from the case sub judice because in *Estelle*, the statement made by the psychiatrist – that the petitioner posed a future risk to the community – was directly used by the jury to sentence the petitioner to death.[1] In the case sub judice, the statement made by the deputy refuted the psychiatrist's testimony that Jordan was easily influenced. There is nothing in the record to indicate that law enforcement surreptitiously placed Deputy Kemp in the room with Dr. White and Jordan during the examination for the sinister motive of eavesdropping to obtain incriminating evidence against Jordan for later use at trial. Additionally, similar testimony was allowed into evidence through Jordan's mother and was not directly rebutted by the State.

¶12. Pursuant to Miss. Code Ann. § 99-39-21 (Rev. 2000), the failure to raise a claim "shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver." The section defines "cause" as "those cases where the legal foundation upon which the claim for relief is based could not have been discovered with reasonable diligence at the time of trial or direct appeal." "Actual prejudice" is defined as "those errors which would have actually adversely affected the ultimate outcome of the conviction or sentence." The petition must allege the necessary facts to prove cause and actual prejudice in order to overcome the procedural bar.

---

[1]In Texas, the jurisdiction from which the petitioner appealed, the jury must find that there is a probability that a defendant would commit criminal acts of violence in the future before it can sentence the defendant to death.

6

¶13. Even if this Court were to find that the testimony elicited from Deputy Sheriff Kemp was improper, Jordan fails to meet the requirements of section 99-39-21. This claim could have been raised before the trial court through an objection to Kemp's testimony, and this claim could have been raised before this Court on direct appeal. Because Jordan could have discovered this error with "reasonable diligence at the time of trial or direct appeal," Jordan fails to meet the cause requirement of the statute. Jordan also fails to show any actual prejudice from this testimony. His mother testified that he was easily influenced, especially by his cousin, Frontrell Edwards. The State did not directly rebut this testimony, as it did the testimony of Dr. White. Because Jordan fails to meet both requirements of Miss. Code Ann. § 99-39-21, the procedural bar is not waived, and he is not entitled to relief on this issue.

¶14. Jordan also claims that the deputy's actions violated his right to independent expert assistance. He cites *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), in which the U.S. Supreme Court held that the Constitution requires that the defense be given access to an independent psychiatric expert when the defendant's competency is in question. The trial judge here did grant Jordan permission to hire an independent expert, and the defense retained the services of Dr. White. Jordan claims that the presence of Deputy Kemp compromised the independence of the psychiatrist hired by the defense. We agree that the better practice would have been for the doctor to examine Jordan in the absence of any law enforcement officers after taking adequate security measures. However, we find that Jordan was given the opportunity to be examined by an independent psychiatrist of his choosing at State expense. The expert testified in accordance with the defense's mitigation theory that

7

Jordan had been led to participate in the crimes by the stronger-willed Edwards. We find no constitutional deprivation requiring post-conviction relief. For the reasons stated, we find this issue to be without merit.

### II. Exculpatory Evidence

¶15. Jordan next contends that the State withheld exculpatory or impeachment evidence relating to two witnesses who testified at trial, Spencer Tracy Nicholson and Mark Holloway. In support of this claim, Jordan attached to his petition the affidavits of Terri Skinner and Donald Mark Phillips to his petition. Jordan also states that a motion for discovery has been pending since April 19, 2001.

¶16. In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), the United States Supreme Court determined that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In order to establish that a *Brady* violation has occurred, the defendant must show:

> a. that the State possessed evidence favorable to the defendant (including impeachment evidence);
> b. that the defendant did not possess the evidence nor could he have obtained it himself with reasonable diligence;
> c. that the prosecution suppressed the favorable evidence; and
> d. that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*King v. State*, 656 So.2d 1168, 1174 (Miss. 1995).

¶17.    In the original petition, Jordan attached affidavits from Terry Skinner and Donald Mark Phillips as the only support for this claim.  Skinner, apparently a friend of Jordan and Edwards at the time of the crimes, stated only that two other witnesses, Spencer Tracy Nicholson and Mark Holloway, might have had information about the crimes.  Much of the affidavit is based on hearsay.  There is no indication in the remainder of the affidavit that the State had any knowledge of the facts as alleged by Skinner.  The affidavit filed by Phillips, an investigator in Kentucky, is completely based on hearsay.  We find very little value in that affidavit.

¶18.    Jordan has produced no evidence that the State withheld any exculpatory evidence from him prior to trial.  Jordan has not identified a single document, statement, or any other evidence which the State had in its possession that was not turned over to the defense.  He likewise makes no argument that the defense could not have interviewed Skinner, Nicholson or Holloway and gotten the same information.  Finally, Jordan makes no showing of any probability of actual prejudice.  We, therefore, find that Jordan has met none of the four *Brady* requirements, and we thus find no merit in this claim.

### III. Ineffective Assistance of Counsel

¶19.    Many of the issues raised in the petition deal with allegations of ineffective assistance of counsel. The standard for determining if a defendant received effective assistance of counsel has often been noted by this Court. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a

9

just result." ***Strickland v. Washington***, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). A defendant must demonstrate that his attorney's actions were deficient *and* that the deficiency prejudiced the defense of the case. ***Id.*** at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." ***Stringer v. State***, 454 So.2d 468, 477 (Miss. 1984) (citing ***Strickland v. Washington***, 466 U.S. at 687, 104 S.Ct. at 2064). The focus of the inquiry must be whether counsel's assistance was reasonable considering the totality of the circumstances. ***Id.*** We have stated:

> Judicial scrutiny of counsel's performance must be highly deferential. (citation omitted) ... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

***Stringer***, 454 So.2d at 477 (citing ***Strickland***, 466 U.S. at 689, 104 S.Ct. at 2065). Defense counsel is presumed competent. ***Hansen v. State***, 649 So.2d 1256, 1258 (Miss. 1993).

> Then, to determine the second prong of prejudice to the defense, the standard is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Mohr v. State***, 584 So.2d 426, 430 (Miss. 1991). This means a "probability sufficient to undermine the confidence in the outcome." ***Id.*** The question here is whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death. ***Strickland***, 466 U.S. at 695, 104 S.Ct. at 2068.

10

There is no constitutional right then to errorless counsel. *Cabello v. State*, 524 So.2d 313, 315 (Miss. 1988); *Mohr v. State*, 584 So.2d 426, 430 (Miss. 1991) (right to effective counsel does not entitle defendant to have an attorney who makes no mistakes at trial; defendant just has right to have competent counsel). If the post-conviction application fails on either of the *Strickland* prongs, the proceedings end. *Neal v. State*, 525 So.2d 1279, 1281 (Miss. 1987); *Mohr v. State*, 584 So.2d 426 (Miss. 1991).

*Davis v. State*, 743 So.2d 326, 334 (Miss. 1999) (citing *Foster v. State*, 687 So.2d 1124, 1130 (Miss. 1996)).

### A. Impeachment Evidence

¶20.    Jordan's initial claim of ineffective assistance of counsel relates to the preceding claim that the State failed to disclose exculpatory evidence.  Jordan argues that  if the State was not guilty of any *Brady* discovery violation, then the attorneys at trial were ineffective in failing to investigate and uncover impeachment evidence pertaining to the testimony offered by Holloway and Nicholson.  Holloway testified that he had seen a gun and car stereo equipment at the house of Edwards and Jordan shortly after the killings. Nicholson also testified that Edwards and Jordan had stolen some stereo equipment and that there had been some discussion about the presence of blood on some car speakers.

¶21.    Jordan now maintains that his attorneys should have cross-examined Nicholson and Holloway about an alleged feud between Roberts and Nicholson and about their alleged involvement with stealing the car speakers and disposing of the car.  Those allegations are discussed in the affidavits filed by Skinner and Phillips, but as we have previously found, those allegations are based on hearsay. Jordan also claims that the defense attorneys should have

11

called witnesses familiar with the reputations of Nicholson and Holloway for truthfulness, although no current affidavits stating that they were not known for truthfulness have been submitted.

¶22. Again, the affidavits submitted by Skinner and Phillips are largely based on hearsay, and we discount them accordingly. However, while it might be possible that there were some minor grounds for impeachment of Nicholson and Holloway that counsel for the defense did not discover prior to trial and did not cover in cross-examination, we find that Jordan has failed to prove that if his counsel were deficient, he was prejudiced by such a deficiency. As noted above, a criminal defendant is not entitled to errorless counsel. *Mohr v. State,* 584 So.2d at 430; *Cabello v. State,* 524 So.2d at 315. Upon a review of the entire record, we are unable to find that any deficiency by the attorneys prejudiced Jordan. Jordan admitted that he knew about the plan to rob and kill someone, that he helped pick out Roberts as the robbery victim, that he fired a shot at Roberts during the robbery and that Roberts fell as a result of that shot. Jordan led the police to the bodies and to where two of the guns used in the crime were hidden. We find that there is no reasonable probability that the result would have been different if Nicholson and Holloway had been cross-examined about the statements in the affidavits attached to the petition. Therefore, Jordan's petition fails to meet both of the requirements of the *Strickland* test as to this issue. Accordingly, this issue is without merit.

### B. Expert Witnesses

12

¶23. Jordan asserts that his attorneys were deficient in failing to retain a ballistics expert at trial. He alleges that his attorneys should have sought an independent ballistics expert who might have determined which pistol fired the fatal shots. The State's pathologist, Dr. Steven Hayne, and the State's ballistics expert, Steve Byrd, were unable to state definitively which pistol had caused the respective wounds to Roberts and Bradley because the bullets had passed through the heads of both victims and only small bullet fragments had been found.

¶24. Miss. Code Ann. § 99-39-9(1)(e) provides that a post-conviction relief petition shall contain:

> (e) A specific statement of the facts which are not within the prisoner's personal knowledge. The motion shall state how or by whom said facts will be proven. Affidavits of the witnesses who will testify and copies of documents or records that will be offered shall be attached to the motion. The affidavits of other persons and the copies of documents and records may be excused upon a showing, which shall be specifically detailed in the motion, of good cause why they cannot be obtained. This showing shall state what the prisoner has done to attempt to obtain the affidavits, records and documents, the production of which he requests the court to excuse.

Jordan has failed to submit documentation from any expert who now claims that he has reviewed the evidence presented at trial and can now testify about which pistol caused which entrance wound. We decline to speculate about such testimony, and we are unable to judge any impact that the testimony might have had on the outcome. We find no ineffective assistance of counsel in the trial attorneys' failure to call a ballistics expert because such an examination could have conclusively determined that Jordan fired the fatal shot. Because Jordan has failed to demonstrate deficient performance and actual prejudice as required by *Strickland*, he is entitled to no relief on this portion of his claim.

13

¶25.    Parenthetically, we note that it made little practical difference who fired which shots. Under Mississippi's accomplice liability statutes, both Edwards and Jordan were equally culpable for the capital murders where the two conspired to rob and kill Roberts.   Miss. Code Ann. § 97-1-3 (Rev. 2000) provides that "[e]very person who shall be an accessory to any felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such; and this whether the principal have been previously convicted or not."   This Court  held in *Crawford v. State*, 133 Miss. 147, 97 So. 534 (1923), that to aid and abet in the commission of a felony, one must "do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime."  *See also Vaughn v. State*, 712 So.2d 721 (Miss. 1998);  *Malone v. State*, 486 So.2d 360, 363 (Miss. 1986) ("One who is an accessory before the fact or one who aids and abets necessarily enters into an agreement that an unlawful act will be done. He participates in the design of the felony.").

¶26.    Jordan was guilty of capital murder as a principal whether the fatal shot came from his pistol or Edwards's pistol.   Jordan admitted that he participated in the planning of the robbery, that he and Edwards discussed killing the eventual victim, that he fired at least one shot and that he helped to dispose of the bodies and the incriminating evidence. It mattered not whether Jordan had produced an expert who could have said that the fatal shot came from a certain pistol. Therefore, we find this issue to be without merit.

   *C. Discovery*

14

¶27.    Jordan next alleges that his attorneys were ineffective in failing to seek complete discovery from the State.   He claims that the discovery sought by the defense attorneys was insufficient, but he provides no specific examples of any helpful evidence that would have been produced had the discovery request been more thorough.

¶28.    More than seven months prior to trial, Jordan's attorneys filed a "Motion to Disclose Evidence" in which they sought discovery of "[a]ny evidence in the possession, custody or control of the State or which may become known or which through due diligence may be learned from the investigating officers or witnesses in the case which relates to any issue in the case for Defendant to prepare for trial . . . ."   The motion included over seven pages of specific requests including names of witnesses known to the State, the entire files of the investigating officers, copies and tapes of any recorded confessions or statements, any scientific tests, any physical evidence, and any exculpatory evidence. From the record, we find that Jordan has not shown deficient performance, as his attorneys filed a motion for discovery specifically requesting the items Jordan now contends should have been requested.

¶29.    As with the deficiency prong of *Strickland*, Jordan has failed to show that he was prejudiced by the actions of his counsel. We find that the request for discovery filed by Jordan's trial counsel was more than adequate and that Jordan has made no showing of ineffective assistance of counsel on this claim. Because Jordan has failed to demonstrate deficient performance and actual prejudice as required by *Strickland*, he is entitled to no relief on this issue, which we find to be meritless.

### D. Voir Dire

¶30. Jordan alleges that the voir dire conducted by his attorneys was insufficient. He claims that his attorneys failed to conduct an adequate voir dire on the meaning of mitigating circumstances.[2]

¶31. In *Russell v. State*, 849 So.2d 95 (Miss. 2003), this Court denied post-conviction relief on the petitioner's allegation that his attorneys were ineffective in failing to adequately voir dire jurors about potential biases. We held that no relief was merited "absent some specific allegation as to any specific juror." *Id*. at 131.

¶32. Jordan's petition fails to single out any juror who should have been excluded for cause on the basis of that juror having a preconceived opinion that the death penalty was the only appropriate penalty in this case and that he or she would not consider the mitigating evidence presented on Jordan's behalf. Jordan also fails to direct this Court to a specific instance in the record where a juror stated that he or she had such strong opinions in favor of the death penalty so as to render impossible consideration of mitigating evidence in making a fair determination as to whether life imprisonment was the more appropriate punishment.

¶33. In reviewing the record, we find that trial counsel fully examined the venire members concerning whether they would automatically impose the sentence of death. Defense counsel discussed each mitigating factor and questioned the jurors as to whether they would consider those factors during their deliberation on sentencing if the trial reached that point. Those

---

[2]In a footnote, Jordan also contends that his trial attorneys failed to voir dire the potential jurors for evidence of racial bias. He does not argue that claim in the petition, and we, therefore, decline to address it further.

jurors who indicated that they would automatically impose the death sentence were excused for cause.

¶34. We find that counsel did in fact do a more than adequate job asking the jurors about their feelings regarding applying the mitigating factors, and we find no constitutionally defective assistance of counsel here. Jordan's petition fails to demonstrate deficient performance by trial counsel and resulting prejudice. Therefore, he is entitled to no relief on this portion of his claim.

### E. Parole Eligibility

¶35. Jordan maintains that his attorneys were ineffective in failing to request that the jury be instructed that a life sentence for capital murder amounted to a life sentence without parole. He claims that the jury may have been concerned that if Jordan were sentenced to life that he might eventually be released on parole when there was no such possibility.

¶36. The record shows that counsel for Jordan did inform the jury that Jordan would never be eligible for parole. Both in voir dire and in his closing arguments, Jordan's attorney stated that if the jury sentenced Jordan to a life sentence that Jordan would spend the rest of his life in prison. Further, counsel for Jordan submitted two jury instructions, which if given, would have informed the jury that a life sentence meant that there was no chance of parole eligibility. The trial court declined to give those instructions after finding that other instructions adequately explained the sentencing options. Jordan did not argue on appeal that the failure to give those instructions was erroneous. The current claim is that his attorneys were ineffective in failing to argue that life imprisonment meant life without parole. The record reveals that the

17

attorneys did in fact make that argument, both orally in closing argument and in the proposed jury instructions. If a trial judge refuses an offered instruction, the petitioner may not use that refusal to demonstrate ineffectiveness of counsel.

¶37. Jordan's petition fails to demonstrate deficient performance because trial counsel presented two specific instructions on this point for consideration by the trial court. Thus, trial counsel attempted to do, by instruction, what Jordan is now contending his trial counsel did not do. Further, as pointed out above, Jordan can show no actual prejudice because the jury was informed that life imprisonment meant life without parole because trial counsel argued this in his closing argument. Jordan's petition fails to meet both *Strickland* requirements; therefore, we find Jordan's claim of ineffective assistance of counsel to be without merit.

### F. Mitigation Evidence

¶38. Jordan claims that his attorneys failed to investigate the case they presented in mitigation during the sentencing phase and they failed to prepare the witnesses they intended to call, thus presenting inadequate mitigation evidence at the penalty phase. Jordan called nine witnesses in the sentencing phase. Those witnesses included Nannie Craft, Jordan's mother; Dr. Reginald White, the court appointed psychiatrist; Rev. James W. Hare, Jordan's minister; Nobia Hare, the minister's wife and a Jordan family friend; Jethro Trotter, Jordan's neighbor and former school bus driver; Edna Johnson, a family friend who had known Jordan since childhood; Officer John Riley, a jailor; and Charles McCree, a jail trustee. Frontrell Edwards was also called as a witness during the penalty phase; however, he invoked his Fifth Amendment rights and refused to answer any substantive questions. Jordan's petition focuses on his

18

attorneys' allegedly deficient performance in preparing his mother and Dr. White to testify during the penalty phase of the trial.

### 1. Nannie Craft

¶39.    Jordan first claims that defense counsel should have prepared his mother, Nannie Craft, to testify about various childhood illnesses and injuries he claims he suffered.   Jordan argues that his mother should have testified about his delayed development as a child, that he had attended special education classes, and that he had grown up in poverty.   Defense counsel attempted to go into Jordan's early childhood medical and developmental history; however, the trial court ruled that unless these medical problems continued to affect him throughout his adult life, they were not relevant. Therefore, the record shows that counsel was aware of the early childhood illness, but he was not allowed to address these areas with Craft due to relevance. Further, Jordan submits no school or medical records or any other documentation supporting these claims; therefore, we have no way of ascertaining the relevance of any alleged childhood illnesses or problems.

¶40.    Jordan also maintains that his attorneys should have clarified questions about Jordan's juvenile records. Jordan's mother was cross-examined about whether Jordan had ever appeared in youth court.   Craft testified that Jordan had been involved in youth court proceedings on approximately three occasions, but she claimed that Frontrell Edwards and Jordan's brother, Michael, were the ones responsible for Jordan's delinquent behavior.   In a speaking objection, Jordan's attorney attempted to explain that "we don't have anything to show that there was ever any adjudication of delinquency, no order entering anything.   All we are talking about are

charges against someone." Counsel also explained in his closing argument that Jordan's mother had testified, as to the youth court matters, that "none of that was Kelvin's fault according to her, not one bit of that. All of those things that he had gotten in trouble about through the years, none of it was his fault; it was always someone else's." Any confusion about Craft's youth court testimony was clarified by counsel.

¶41. Jordan's petition has not demonstrated deficient performance on the part of counsel, nor has the petition shown any prejudice suffered by Jordan. Because Jordan has failed to meet the requirements of the *Strickland* test, he is entitled to no relief as to this issue, which we find to be without merit.

### 2. Dr. Reginald White

¶42. Jordan claims that neurological testing should have been performed to determine if he suffered from any brain dysfunction or mental retardation. He has not submitted any new testing which would confirm any mental incapacity, and he does not support this argument with any new evidence. We decline to find that the attorneys were deficient where Jordan has still not produced any medical evidence which his prior attorneys should have found.

### 3. Other Witnesses

¶43. Additionally, Jordan has not submitted any substantial affidavits of witnesses who now claim that they had relevant evidence which would have assisted the case in mitigation and that they were willing to testify if they had been contacted or called by the defense attorneys. Attorneys in a death penalty trial have a duty to investigate and present mitigation evidence for the sentencing phase. *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2535, 156 L.Ed.2d

20

471 (2003); *Simmons v. State*, 869 So.2d 995, 1000-01 (Miss. 2004); *Grayson v. State*, 879 So.2d 1008, 1016-17 (Miss. 2004). We conclude that Jordan has not submitted sufficient evidence of a breach of the duty of counsel to investigate and present mitigation evidence as required, and we determine that counsels' performance was not constitutionally ineffective pursuant to *Strickland*. Taken as a whole, we find that the mitigation case was adequately presented. The defense called nine witnesses. The defense was able to attempt to portray Jordan as a mild-mannered, well-behaved young man who was susceptible to manipulation by Frontrell Edwards. The mere fact that the jury did not accept the defense's argument that Jordan's life should be spared does not mean that the attorneys who made that argument were ineffective. Because Jordan has failed to meet the requirements of the *Strickland* test, he is entitled to no relief as to this issue.

### G. Closing Argument During Sentencing Phase

¶44.    Jordan argues that counsel was deficient in failing to object to a statement made by the prosecutor in his closing argument. Jordan argues that the prosecutor informed the jury that they were not "being asked to kill anybody," thus diminishing their responsibility for the imposition of a sentence of death in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). However, the complete statement made by the prosecutor was:

> You are not being asked to kill anybody. You are being asked to look at the evidence in this case. And if the aggravating factors outweigh the mitigating factors, you are being asked to give a sentence that is authorized under the law, a sentence that the State of Mississippi recognizes and authorizes you to give.

This comment was in response to defense counsel's statements made during closing argument. Counsel stated that the jury had Jordan's life in their hands and that the jury had "the awful job" of deciding "whether this man is so beyond redemption that he should be eliminated from the human community." Counsel further argued that:

> You know, we have always had, all of us have always had to come to grips with killing somebody. You and I could be driving down the road and a dog runs out in front of us. And you know what we do? We go to great lengths to dodge that dog to try and avoid running over it. I suggest to you, ladies and gentlemen, that in our world and in our society, executing someone is intentionally doing what I just said.

¶45. The comments made by the prosecutor are not in violation of *Caldwell*. In fact, these appropriate statements made during the State's closing arguments in the sentencing phase of Jordan's trial pales in comparison to the prosecutor's statements made during the closing arguments in Bobby Caldwell's trial.[3] In *Caldwell*, defense counsel argued to the jury during the sentencing phase that life was precious and that the jury had an "awesome responsibility" in deciding whether Bobby Caldwell would live or die. In the State's rebuttal during closing arguments, the prosecutor sought to lessen in the minds of the jurors their solemn responsibility and role in this state's statutory capital sentencing scheme. The assistant district attorney argued, inter alia:

> ASSISTANT DISTRICT ATTORNEY: Ladies and gentlemen, I intend to be brief. I'm in complete disagreement with the approach the defense has taken. I don't think it's fair. I think it's unfair. I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know – they

---

[3]Caldwell's conviction and death sentence were affirmed on direct appeal to this Court. *Caldwell v. State*, 443 So.2d 806 (Miss. 1983).

22

know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it. Yet they......

COUNSEL FOR DEFENDANT: Your Honor, I'm going to object to this statement. It's out of order.

ASSISTANT DISTRICT ATTORNEY: Your Honor, throughout their argument, they said this panel was going to kill this man. I think that's terribly unfair.

THE COURT: Alright, go on and make the full expression so the Jury will not be confused. I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands. I think that information is now needed by the Jury so they will not be confused.

ASSISTANT DISTRICT ATTORNEY: Throughout their remarks, they attempted to give you the opposite, sparing the truth. They said "Thou shalt not kill." If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as [the trial judge] has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so.

472. U.S. at 325-26, 105 S.Ct. at 2637-38.

¶46. The United States Supreme Court vacated Caldwell's death sentence since the prosecutor had led the jury "to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328-29, 105 S.Ct. at 2639. Obviously, under Mississippi's statutory capital sentencing scheme, notwithstanding the fact that a death sentence imposition will be reviewed by many judges, a capital defendant will be subjected to the death penalty only if so found by the jury. The judge alone can never impose the death penalty. *See* Miss. Code Ann. § 99-19-103 (Rev. 2000).

¶47.    The objectionable comments by the prosecutor in Jordan's case are not comparable to those made by the prosecutor in *Caldwell*.  This issue is without merit.


### H. Testimony of Charles McCree

¶48.    Charles McCree was the Clarke County jail trustee who testified in the sentencing phase that Edwards had told him that he had killed Roberts and Bradley and that Jordan had been opposed to the killings.   Jordan now claims that his attorneys at trial should have called McCree during the *guilt* phase.

¶49.    The State argues that McCree's testimony would have been of little value at the guilt phase because Jordan had confessed his involvement in the robbery plan, had known that the victim would be killed, and had in fact fired a shot at Roberts. Under this State's laws concerning principals and accomplice culpability, it mattered not whether Edwards had admitted that he shot Roberts and Bradley since Jordan had admitted from the beginning that he participated in the robbery and killing. The State further maintains that McCree's testimony had potentially more impact at the sentencing phase where the defense's theory was that Edwards was the leader and that Jordan had been influenced by Edwards.

¶50.    Decisions regarding which witnesses to call and when to call them are within the realm of trial strategy.  *Gray v. State*, 887 So.2d 158, 168 (Miss. 2004), citing *King v. State*, 679 So.2d 208, 211 (Miss. 1996).   By calling McCree during the penalty phase, we acknowledge that defense counsel for Jordan knew about McCree and his testimony. Defense counsel may well have considered McCree's potential testimony and determined that it would be more

24

effective at the sentencing phase. We must presume that counsel for the defendant was competent. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *Stringer*, 454 So.2d at 477. There is no reasonable probability that the outcome of this trial would have been different had McCree testified during the guilt phase of the trial.

¶51. We find that the decision to call McCree at the sentencing phase and not at the guilt phase was acceptable trial strategy. It is certainly possible that the jury would have given more weight to McCree's testimony in the sentencing phase. Furthermore, even if we were to alternatively find that the decision not to present McCree's testimony at the guilt phase was deficient, which we do not, we find no prejudice to Jordan under the second *Strickland* prong. Again, Jordan had admitted complicity in the plan to find and rob a victim for cash to go to a football game. He had confessed that he knew that the plan was to kill the victim to avoid detection. He admitted that he had suggested Roberts as the gas station customer to rob. He admitted that he fired one shot at Roberts and that he had helped dispose of the bodies. The fact that Edwards had also confessed his complicity would have had no effect on the issue of whether Jordan was also guilty. Because Jordan has failed to meet the requirements of the *Strickland* test, he is entitled to no relief as to this issue.

### I. Preservation of Issues for Appeal

¶52. Jordan maintains that his attorneys at trial were deficient in failing to preserve two issues for the eventual direct appeal. He first claims that his attorneys should have objected to the improper use of juvenile court records at the sentencing phase. As discussed above, the

25

State cross-examined Jordan's mother after she testified at the sentencing hearing that Jordan had been a peaceful child who had not been in much trouble. The prosecutor used youth court records to show that Kelvin and others had been charged with various delinquent acts. The mother explained that Kelvin had been brought into youth court on several occasions but that it had always been for acts actually done by his cousin Frontrell or his brother Michael. Jordan now claims that his attorneys should have objected to the use of the youth court records.

¶53. The record reveals that counsel did in fact pose two objections during the cross-examination about the youth court records. Counsel first objected to the questioning about the records because the records were not in the record and the prosecutor was "arguing facts not in existence." That objection was overruled. The defense attorney later objected to the line of questioning because "we don't have anything to show that there was ever any adjudication of delinquency, no order entering anything. All we are talking about are charges against someone." Additionally, this issue was raised on direct appeal, where this Court found that the cross-examination about the youth court records was proper. *Jordan*, 728 So.2d at 1098. We now find that there is no basis for a finding of ineffective assistance of counsel where the attorneys did raise relevant objections and where this Court has already found that there was no error in the use of the youth court records.

¶54. Jordan also claims that his attorneys should have objected to the State's argument at the penalty phase that the jury was not responsible for killing the defendant if it imposed the death sentence. He claims that argument stripped the jury's sense of responsibility for returning a sentence of death. For the same reasons as discussed in *III G.*, above, we find that Jordan has

26

failed to meet the requirements of the *Strickland* test, and he is thus entitled to no relief as to this issue.

### *J. Defense of International Treaties*

¶55.    Jordan alleges that his attorneys were ineffective in failing to raise various international treaties as defenses to imposition of the death penalty.  He cites the International Covenant on Civil and Political Rights, the International Convention on the Elimination of All Forms of Racial Discrimination, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the American Convention on Human Rights, the International Covenant on Economic, Social and Cultural Rights, and other treaties enacted by the United States Senate or signed by the President of the United States.  He claims that those treaties are to be enforced under the supremacy clause and that they prohibit his execution.

¶56.    In considering death penalty cases via direct appeal and post-conviction relief proceedings, we apply the Constitution of the United States, the Constitution and laws of the State of Mississippi, and case law as handed down by the United States Supreme Court and this Court.  Of course, we also look to federal court decisions from this State and federal and state court cases from our sister states for persuasive guidance.  On this note, however, we unhesitatingly acknowledge the United States Supreme Court's recent decision in *Roper v. Simmons*, 543 U.S. __, 125 S.Ct. 1183, 161 L. Ed. 2d 1 (March 1, 2005), where the Court in a 5-4 decision declared that death penalty imposition upon offenders who were under the age of 18 when the crimes were committed was violative of the Eighth and Fourteenth

27

Amendments to our federal constitution. In reaching this conclusion, the sharply divided Court relied in part on national and international studies, covenants and treaties. Such reliance generated scathing dissents from Justice O'Connor and Justice Scalia, with Chief Justice Rehnquist and Justice Thomas joining Justice Scalia's dissent. However, in our case today, we note that Jordan's date of birth is December 25, 1976, and the date of these murders was October 5, 1995. Inasmuch as Jordan was 18 years of age – and only 81 days away from his 19th birthday – at the time of the brutal murders of Tony Roberts and 2-year old Codera Bradley, we decline to rely on international laws, covenants and treaties in determining whether the death penalty is appropriate.

¶57. Therefore, defense counsel was not ineffective in failing to raise claims under these various treaties, covenants and conventions, and Jordan's petition has failed to allege any actual prejudice in the failure to raise such claims. We find this issue to be without merit. Because Jordan has failed to meet the requirements of the *Strickland* test, he is entitled to no relief as to this issue.

### IV. Admission of Evidence at the Sentencing Phase

¶58. Jordan claims that the trial court should have allowed him to delve into Frontrell Edwards's alleged intimidation or domination of Jordan. The trial court allowed Jordan's mother to testify that Edwards had once shot Jordan. However, the trial court ruled that Jordan's mother, Nannie Craft, could not testify further about the event because she had no firsthand knowledge of the shooting. Jordan also claims that the trial court should have allowed him to put on evidence that he suffered from several illnesses as a child. As this Court has

28

previously stated, the trial court ruled that without some showing that the childhood illnesses had an impact on Jordan as an adult, the proposed testimony was irrelevant.

¶59.   These claims are barred for failure to raise the claim on direct appeal of this case. No claim was presented to this Court on the basis of the trial court's sustaining of the objection to this line of questioning. Such a claim can not be raised for the first time on post-conviction review. *See* Miss. Code Ann. § 99-39-21(1); ***Bishop v. State***, 882 So. 2d 135, 149 (Miss. 2004); ***Grayson v. State***, 879 So. 2d 1009, 1020 (Miss. 2004). By failing to present proof to support these assertions, Jordan's petition has failed to demonstrate cause and actual prejudice as required by Miss. Code Ann. § 99-39-21; therefore, the procedural bar is not waived.

¶60.   Procedural bar aside, Jordan makes no argument under this issue, and he cites no authority.  Thus, we decline to address these claims.  ***Brown v. State***, 798 So.2d 481, 497, 506 (Miss. 2001) (citing ***Holland v. State***, 705 So.2d 307, 329 (Miss. 1997)).   *See also **Gary v. State***, 760 So.2d 743, 754 (Miss. 2000) (this Court may, at its discretion, refuse to review an assignment of error not supported by authority yet this is not an absolute bar). We find this issue to be without merit.

¶61.   The trial court held a hearing on the issue of childhood illnesses. Finding that these illnesses did not affect Jordan during his adult life, the trial court found them to be irrelevant. We find this ruling to be proper. Also as previously stated, Jordan was able to argue that he was, at times, dominated by other people, especially Frontrell Edwards. Although we hold these claims are procedurally barred, they are likewise without merit.

29

**V. The State's Conflicting Theories of the Case**

¶62. Jordan claims that the State's theory at his trial conflicts with the State's theory at Edwards's later trial for the same two capital murders. During closing argument in the guilt phase of Jordan's trial, the District Attorney argued that "this man right over here [Jordan] fired that fatal shot." Later, in Edwards's trial, the District Attorney argued that Edwards "is responsible for both of these murders." Jordan claims that the theories conflict and that he was deprived of a fair trial and sentencing hearing.

¶63. This claim was not raised at trial or on direct appeal; therefore, this claim is barred from consideration for the first time on post-conviction review. *See* Miss. Code Ann. § 99-39-21. *See also* **Wiley v. State**, 751 So. 2d 1193, 1208 (Miss. 1999).

¶64. Procedural bar aside, we find that the statements do not conflict. The statement that Jordan fired the shot that killed Roberts is consistent with the State's theory in Jordan's trial and with the evidence. Jordan admitted that he fired one shot at Roberts after Edwards shot him first. Jordan stated that his shot caused Roberts to fall. Roberts was shot twice in the head with only one of the wounds being fatal. That statement does not contradict the District Attorney's later argument that Edwards was responsible for both murders. In fact, both Edwards and Jordan were responsible for both murders by participating in the plan to rob and kill the victim in order to prevent later identification and by shooting at Roberts and disposing of the bodies. This argument does not demonstrate the cause and actual prejudice necessary to overcome the procedural bar to the consideration of this claim for the first time on post-conviction review. We find no merit in this issue.

**VI. Disproportionate Sentence**

¶65. Frontrell Edwards's trial commenced after Jordan's, and he was also convicted of two counts of capital murder and was sentenced to death. On appeal, this Court reversed the convictions and sentences on several bases and the matter was remanded to the circuit court for retrial. *Edwards v. State*, 737 So.2d 275 (Miss. 1999). Without attaching any court records, affidavits or other proof as required by Miss. Code Ann. § 99-39-9(1)(e), Jordan contends that Edwards entered into a plea agreement for a sentence of life without parole. Jordan claims that Edwards was the leader in the robbery scheme, that he had a motive and plan to kill Roberts, and that Jordan was an unwilling participant in the robbery and murder scheme. Therefore, he claims that he is less culpable than Edwards and that their sentences are disproportionate. However, Jordan's petition has failed to support his claim that he was not an active participant in these murders with the proof required by the post-conviction statutes.

¶66. First, we find that the proportionality question was decided in Jordan's direct appeal. There, this Court reviewed the proportionality of Jordan's death penalty and found that the sentence was not disproportionate when compared to other death penalty situations. *Jordan*, 728 So. 2d at 1099-1100. Therefore, the issue of the proportionality of the sentence of death in this case is res judicata. *See* Miss. Code Ann. § 99-39-21(3); *Doss v. State*, 882 So. 2d 176 (Miss. 2004); *Bishop v. State*, 882 So. 2d 135 (Miss. 2004) (relitigation of disproportionality argument barred by Miss. Code Ann. § 99-39-21(3)).

¶67.  Alternatively, this issue is without merit. Jordan now argues that his sentence is disproportionate to the sentence ultimately imposed upon Frontrell Edwards. On direct appeal, this Court determined that Jordan was a major actor in this double murder. As previously stated, Jordan confessed to his actions in this case. He knew and approved of the plan to rob and kill a convenient gas station customer. He pointed out Roberts as a likely prospect. He had a pistol in his possession when he encountered Roberts and his helpless two-year old child. He fired at least one shot at Roberts, and he helped dispose of the body. There is very little evidence that Jordan was less than a willing accomplice in these crimes.

¶68.  In *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the U.S. Supreme Court stated:

> McCleskey's argument that the Constitution condemns the discretion allowed decision makers in the Georgia capital sentencing system is antithetical to the fundamental role of discretion in our criminal justice system. Discretion in the criminal justice system offers substantial benefits to the criminal defendant. Not only can a jury decline to impose the death sentence, it can decline to convict or choose to convict of a lesser offense. Whereas decisions against a defendant's interest may be reversed by the trial judge or on appeal, these discretionary exercises of leniency are final and unreviewable. Similarly, the capacity of prosecutorial discretion to provide individualized justice is "firmly entrenched in American law." As we have noted, a prosecutor can decline to charge, offer a plea bargain, or decline to seek a death sentence in any particular case. Of course, "the power to be lenient [also] is the power to discriminate," but a capital punishment system that did not allow for discretionary acts of leniency "would be totally alien to our notions of criminal justice."

*Id.* at 311-12, 107 S.Ct. at 1777-78, 95 L.Ed.2d at 291 (citations & footnotes omitted). *See also Ladner v. State*, 584 So.2d 743, 750-51 (Miss. 1991). The State is entitled to exercise some discretion in deciding against whom to pursue the death penalty. This Court has held that

32

even though a co-defendant might have received a life sentence, there is no prohibition against another co-defendant being sentenced to death. *Walker v. State*, 671 So.2d 581 (Miss. 1995); *Mack v. State*, 650 So.2d 1289 (Miss. 1994); *Ladner v. State*, 584 So.2d 743 (Miss. 1991); *Culberson v. State*, 379 So.2d 499 (Miss. 1979).

¶69.   In the federal statutory framework, there is a specific mitigating factor which states that the jury may consider whether "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death." 18 U.S.C. § 3592(a)(4).   Thus, in federal death penalty actions, the jury can consider whether some other defendant has escaped the death penalty and whether that entitles the subject defendant to any leniency.   There is, however, no requirement that all equally culpable defendants receive the same punishment.

¶70.   Jordan relies on *Randall v. State*, 806 So.2d 185 (Miss. 2001), where this Court found that the defendant's death sentence was disproportionate. There, five defendants robbed Eugene Daniels and killed him in the course of the robbery at his apartment. The State was unable to prove definitively which defendant was the actual triggerman. The jury found that Randall had contemplated that lethal force would be employed but the jury *did not* find that Randall actually killed the victim, attempted to kill him, or intended that a killing take place. *Id.* at 233-34.   In contrast, Jordan's jury found that Jordan had attempted to kill Roberts; that Jordan had intended that the killing of Roberts take place; and, that Jordan contemplated that lethal force would be employed. The jury further found that Jordan intended that the killing of Codera Bradley take place and that he had contemplated prior to the killing that lethal force would be employed.

33

¶71.    Under the circumstances here, we find that the lone fact that Jordan received the death penalty while Edwards did not is insufficient to establish a disproportionate or constitutionally excessive sentence.    After a full review of the record and after considering all of the aggravating and mitigating circumstances presented at trial, and after a comparison with the circumstances of other capital murder cases, we are of the opinion that imposition of the death penalty in Jordan's case is not disproportionate or excessive. Thus, this issue is without merit.

### VII. *Atkins v. Virginia and Ring v. Arizona*

¶72.    On June 19, 2003, Jordan filed an amended petition for post-conviction relief. Jordan's amended petition is based on *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

¶73.    In *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the United States Supreme Court held that the execution of mentally retarded inmates amounted to cruel and unusual punishment and was therefore prohibited by the Eighth Amendment.    In his first supplement to the petition for post-conviction relief, Jordan alleges that he has suffered from "mental retardation and its attendant adaptive deficits since early childhood." The only indications of mental retardation he provides are that his childhood development was slow, that he did not learn to walk until he was two years old, that he suffered from meningitis as a child which might have caused brain injury; and, that he was placed in special education classes in school.    None of those allegations are supported by any affidavits of mental health

professionals or by any documentary or medical evidence. Based on these allegations alone, Jordan seeks a hearing on whether he is mentally retarded.

¶74.    On May 20, 2004, we announced the requirements for obtaining a hearing to determine whether a capital defendant is mentally retarded in *Chase v. State*, 873 So. 2d 1013 (Miss. 2004). This Court held:

> With the sole exception discussed below, no defendant may be granted a hearing on the issue of Eighth Amendment protection from execution, due to alleged mental retardation unless, prior to the expiration of the deadline set by the trial court for filing motions, the defendant shall have filed with the trial court a motion, seeking such hearing. The defendant must attach to the motion an affidavit from at least one expert, qualified as described above, who opines, to a reasonable degree of certainty, that: (1) the defendant has a combined Intelligence Quotient ("IQ") of 75 or below, and; (2) in the opinion of the expert, there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded, as defined herein.

> Upon receiving such motion with attached affidavit, and any response filed by the State, the trial court shall provide a reasonable amount of time for testing the defendant for mental retardation. Thereafter, the trial court shall set a hearing on the motion, and the matter shall proceed.

*Id.* at 1029. We further held:

> We hold that no defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that:
> 1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;
> 2. The defendant has completed the Minnesota Multi phasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

> Such expert must be a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an

expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation.

Upon meeting this initial requirement to go forward, the defendant may present such other opinions and evidence as the trial court may allow pursuant to the Mississippi Rules of Evidence.

*Id.* On August 26, 2004, this Court further addressed the question of what is required in order to obtain a hearing under *Atkins* in *Wiley v. State*, 890 So. 2d 892 (Miss. 2004). This Court in *Wiley* held:

This Court spoke of evolving standards in *Chase*, 873 So.2d at 1024. We now find it necessary to expand on the procedure to be used in reaching a determination of mental retardation by holding that this Court will consider the entire record before it in deciding whether to grant an Atkins hearing.

The standard set out by this Court in *Chase*, 873 So.2d at 1028, and cited herein establishes the minimum requirements for a person to be adjudged mentally retarded. This Court said "[n]o defendant may be adjudged mentally retarded ... unless" that defendant produces an expert opinion that the defendant is retarded and has completed the MMPI-II. That does not mean that every defendant who submits an expert opinion to this Court and has completed the MMPI-II will be adjudged mentally retarded for the purposes of Atkins. Further, Wiley does not even assert that he has completed the MMPI-II or some similar test to show that he is not malingering. There is a mention of the MMPI-II in the 1987 affidavit of Dr. Fox, but nothing in this most recent motion.

890 So. 2d at 897-98.

¶75. Jordan's *Atkins* claim is unsupported by any affidavits or records indicating that he has an I.Q. of less than 76. Further, there is no indication that he has completed the MMPI-II. Jordan's petition has failed to support his claim of retardation under the precedent announced in *Chase*; therefore, Jordan is not entitled to an evidentiary hearing on his claim of mental retardation.

¶76.    Jordan also claims that the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requires that the jury be allowed to determine whether he is mentally retarded.   On the same day that the petitioner filed the amended petition raising the *Ring* claim, this Court decided this same issue in *Russell v. State*, 849 So.2d 95 (Miss. 2003).   There, the Court stated that "[w]e find that not being mentally retarded is not an aggravating factor necessary for imposition of the death penalty, and *Ring* has no application to an *Atkins* determination."   *Id*. at 148.   This precise issue has previously been decided by this Court adversely to Jordan's position, and we rely on the previous holding.

¶77.    Jordan also claims that the *Ring* decision and its predecessor *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), require a new trial because the aggravating factors were not included in the indictment.   As with the prior issue, this Court has addressed these identical claims in a previous decision.   In *Berry v. State*, 882 So.2d 157 (Miss. 2004), this Court determined that *Ring* and *Apprendi* have no applicability to Mississippi's capital murder sentencing scheme.   *Id.* at 12.   This issue is thus without merit.

### VIII. Cruel and Unusual Punishment

¶78.    Jordan argues that lethal injection causes undue suffering and lingering death.   He claims that the unnecessary infliction of pain and the prolonged period of pain experienced by the condemned person violates evolving standards of decency and amounts to cruel and unusual punishment. Jordan failed to make any claim relating to the method of execution at trial or on direct appeal. Therefore, this claim is barred for consideration for the first time on application

for leave to seek post-conviction relief. *See* Miss. Code Ann. § 99-39-21(1); **Bishop v. State**, 882 So. 2d 135, 149 (Miss. 2004); **Grayson v. State**, 879 So. 2d 1009, 1020 (Miss. 2004). Notwithstanding the procedural bar, this issue is without merit.

¶79.     In support of his allegations, Jordan cites only **Nelson v. Campbell**, 541 U.S. 637, 124 S.Ct 2117, 158 L.Ed.2d 294 (2004). At the time of the filing of Jordan's amended petition, the U.S. Supreme Court had granted certiorari in **Nelson**.  Since then, the opinion has been issued. In **Nelson**, an Alabama death row inmate sought to file a 42 U.S.C. §1983 action challenging Alabama's proposed lethal injection procedure.  Nelson had vein damage due to years of drug use and lethal injection by conventional needle procedures would not work on his veins.  He filed a section 1983 action challenging the "cut down" injection procedure in which a vein in his arm or leg would be catheterized prior to the legal injection.  The lower courts determined that section 1983 was not a proper vehicle to challenge the "cut down" procedure.  The U.S. Supreme Court ruled that section 1983 was available in the petitioner's attempts to gain injunctive relief.  **Nelson v. Campbell**, 541 U.S. 637, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004).  Notably, the Court did not rule on the constitutionality of lethal injection or even on whether the proposed "cut down" procedure amounted to cruel and unusual punishment.  The decision is merely procedural and is therefore inapplicable here.

¶80.     Jordan fails to support his claim that lethal injection is a cruel and unusual method of execution with any sworn proof as is required by Miss. Code Ann. § 99-39-9(1)(e). This Court has also recently decided that Mississippi's lethal injection procedure does not amount to

cruel and unusual punishment and is not a constitutional deprivation. *Russell,* 849 So.2d at 144-45. We find this issue to be without merit.

### IX. Capital Sentencing Scheme

¶81.    Jordan alleges that "Mississippi's capital sentencing scheme creates a substantial risk that death will be inflicted in an arbitrary and capricious manner on a defendant convicted of felony murder." Jordan does not specifically argue any deficiencies in Mississippi's capital punishment framework. Jordan failed to make any claim relating to the capital sentencing scheme at trial or on direct appeal. Therefore, this claim is barred for consideration for the first time on this post-conviction motion. *See* Miss. Code Ann. § 99-39-21(1); *Bishop v. State*, 882 So. 2d 135, 149 (Miss. 2004); *Grayson v. State*, 879 So. 2d 1009, 1020 (Miss. 2004).

¶82.    Procedural bar aside, we find no constitutional deficiencies in Miss. Code Ann. §§ 99-19-101 et seq. We have held that the Mississippi capital murder scheme is not unconstitutional because the underlying felony is used both to elevate the crime to capital murder, and also used later as an aggravating circumstance. *West v. State*, 725 So. 2d 872, 894 (Miss. 1998); *Ballenger v. State*, 667 So. 2d 1242, 1260-61 (Miss. 1995). Therefore, this issue is without merit, and Jordan is entitled to no relief.

### X. Jury Instructions

¶83.    Jordan alleges that the trial court erred in refusing to give certain proposed defense instructions. This claim could have been raised on direct appeal and is procedurally barred in

these post-conviction relief proceedings. *See* Miss. Code Ann. § 99-39-21(1); ***Bishop v. State***, 882 So. 2d 135, 149 (Miss. 2004); ***Grayson v. State***, 879 So. 2d 1009, 1020 (Miss. 2004). Furthermore, Jordan cites no authority to support the claim that these instructions should have been given. In ***Puckett v. State***, 879 So. 2d 920 (Miss. 2004), this Court held that issues unsupported by authority were considered abandoned by the petitioner. Jordan has shown neither cause or actual prejudice in any attempt to overcome the bar to the consideration of the merits on this claim.

¶84.    Nevertheless, we find the claim to be without merit. After a review of all of the instructions, we find that the jury was properly instructed in the sentencing phase and that the proposed instructions were properly refused.

¶85.    Jordan first contends Instruction D-4-S[4] was improperly denied. This instruction deals with aggravating factors outweighing mitigating factors. This Court has held that a capital defendant is not entitled to an instruction stating that the aggravating circumstances must outweigh the mitigating circumstances "beyond a reasonable doubt." Beyond a reasonable doubt is not the burden on the weighing process. The statute only requires the jury to find that the mitigating factors outweigh the aggravating circumstances. Miss. Code Ann. § 99-19-101(2)(c); ***Edwards v. State***, 737 So. 2d 275 (Miss. 1999); ***Berry v. State***, 703 So. 2d 269 (Miss. 1997).

---

[4]From the record it appears that Jordan is referring to D-5-S, not D-4-S.

¶86.   As to instruction D-7-S, which states that each individual juror must find beyond a reasonable doubt that death is the only appropriate punishment, we find this instruction was also properly refused by the trial court. We have held that a defendant is not entitled to an instruction informing the jury that it must find, beyond a reasonable doubt, that death is the only appropriate penalty. The statute merely requires that (1) a unanimous finding, beyond a reasonable doubt, of the existence of one or more of the aggravating circumstances; (2) there are insufficient mitigating circumstances to outweigh the aggravating circumstances; and, (3) a unanimous finding that the defendant should suffer death. Miss. Code Ann. § 99-19-103. *Simmons v. State*, 805 So. 2d 452 (Miss. 2001); *Williams v. State*, 684 So. 2d 1179 (Miss. 1996).

¶87.   As to instruction D-8-S, this instruction would have informed the jury that Jordan will never be eligible for pardon or parole. In addition to being a misstatement of law as worded, this instruction was repetitive because the Court's instruction, Instruction C-2-S, fully informed the jury of its sentencing options. Therefore, the jury was fully informed through the instructions that it could sentence Jordan to life imprisonment without the possibility of parole or any type of early release. In addition to being procedurally barred, this issue is without merit, and Jordan is entitled to no relief on this claim.

### XI. Voir Dire

¶88.   Jordan alleges that group voir dire, as opposed to individual voir dire, "created a climate in which petitioner was unable to discern jurors' true feelings and predilections" and prevented the selection of a fair and impartial jury. This issue could have been raised at trial and on direct

appeal and is therefore barred here. Miss. Code Ann. § 99-39-21; *Bishop v. State*, 882 So. 2d 135, 149 (Miss. 2004).

¶89.    Notwithstanding the procedural bar, we find the issue to be without merit. Jordan was allowed to interview several panel members in an individual setting when their answers to questions required sensitive treatment. Jordan's claim regarding the manner in which voir dire was conducted is without merit.

### XII. Jury Qualifications

¶90.    Jordan next alleges that Miss. Code Ann. § 13-5-1, which requires jurors to be twenty-one years of age or older, deprives him of his right to a jury of his peers. Jordan was eighteen years old at the time of the murders. First, this issue could have been raised at trial and on direct appeal and is therefore barred here. Miss. Code Ann. § 99-39-21(1); *Bishop v. State*, 882 So. 2d 135, 149 (Miss. 2004). Second, Jordan cites no authority here in support of his claim. Because Jordan's petition fails to demonstrate cause and actual prejudice to overcome this bar, this claim is barred from consideration.

¶91.    Notwithstanding the procedural bar, this Court has repeatedly rejected this argument, most recently in *Howell v. State*, 860 So.2d 704, 723-24 (Miss. 2003), *certiorari dismissed as improvidently granted*, 125 S.Ct. 856, 160 L.Ed.2d 873 (2005), and has held the provisions of Miss. Code Ann. § 13-5-1 are constitutional. Therefore, this issue is without merit, and Jordan is entitled to no relief on this claim.

### XIII.   Cumulative Error in the Guilt Phase.

¶92.   As we have found find no error in the guilt phase, we necessarily find no cumulative error requiring post-conviction relief. If there is "no reversible error in any part, so there is no reversible error to the whole." *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987). *See also Byrom v. State*, 863 So. 2d 836, 847 (Miss. 2003); *Caston v. State*, 823 So.2d 473, 509 (Miss. 2002); *Hicks v. State*, 812 So.2d 179, 195 (Miss. 2002). Therefore, this issue is without merit.

### XIV.   Cumulative Error in the Penalty Phase.

¶93.   As we have found no error in the penalty phase, we necessarily find no cumulative error requiring post-conviction relief. If there is "no reversible error in any part, so there is no reversible error to the whole." *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987). *See also Byrom v. State*, 863 So. 2d 836, 847 (Miss. 2003); *Caston v. State*, 823 So.2d 473, 509 (Miss. 2002); *Hicks v. State*, 812 So.2d 179, 195 (Miss. 2002). Therefore, this issue is without merit.

### CONCLUSION

¶94.   Jordan participated in a robbery which resulted in the brutal murders of Tony Roberts and two-year-old Codera Bradley. He confessed that he took part in the crimes, and he admitted that he shot Roberts.  After finding Jordan guilty of two counts of capital murder, the jury proceeded to consider all the evidence introduced at the guilt and penalty phases of the trial.  Upon considering this evidence, including the aggravating and mitigating evidence, the same jury determined that Jordan should suffer the penalty of death.  After a meticulous review

of the record, we find no error requiring vacation of the judgment of conviction and imposition of the death penalty. Accordingly, for the reasons herein stated, we find that Jordan is not entitled to seek post-conviction relief; therefore, his post-conviction relief motion is denied.

¶95. **LEAVE TO SEEK POST-CONVICTION RELIEF, DENIED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, J., NOT PARTICIPATING.**