# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-DR-00625-SCT

*FRED SANFORD SPICER, JR. a/k/a FREDDIE SPICER, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/01/2003 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | GEORGE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | AMY L. VAN GELDER |
| | CHRISTINA M. TCHEN |
| | HOPE E. CALDER |
| | DAVID PEHLKE |
| | DAVID PROHOFSKY |
| | MICHAEL ADELMAN |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| | JASON L. DAVIS |
| DISTRICT ATTORNEY: | ANTHONY N. LAWRENCE, III |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | PETITION FOR POST-CONVICTION RELIEF IS GRANTED IN PART AND DENIED IN PART - 11/08/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1. Fred Sanford Spicer, Jr., was found guilty of capital murder after a jury trial in George County, Mississippi. At the conclusion of Spicer's sentencing hearing, the jury returned a

sentence of death by lethal injection. The subsequently-filed Motion for New Trial or in the Alternative J.N.O.V. was denied, and Spicer appealed. Spicer raised fourteen assignments of error. On January 5, 2006, this Court affirmed Spicer's conviction and sentence. *Spicer v. State*, 921 So. 2d 292 (Miss. 2006).

¶2. Spicer now comes before this Court on his Petition for Post-Conviction Relief filed by counsel. The majority of the claims Spicer raises are barred or found to be without merit. However, for the reasons discussed first in this opinion, the Court finds that Spicer should be granted leave to proceed in the trial court for an evidentiary hearing, limited to Spicer's allegation that his attorneys were ineffective during the penalty phase of the trial for failure to investigate and introduce mitigation evidence of Spicer's "social history."[1]

**STATEMENT OF THE FACTS**

¶3. A full statement of the facts can be found in this Court's opinion on Spicer's direct appeal. *See **Spicer***, 921 So. 2d at 299-302 (Miss. 2006). However, for the purpose of this opinion, a cursory review of the facts is all that is necessary for the discussion here.

¶4. In late September 2001, Edmond Hebert invited Fred Spicer to live with him in his trailer located at 170 Pinewood Drive, Lucedale, Mississippi. Hebert also helped Spicer obtain employment with a roofing company. On October 12, 2001, Hebert's mother, Patricia Elder, received a phone call from the employer of Hebert and Spicer, stating that the two had been fired for not showing up for work. Mrs. Elder lived next to Hebert's trailer, and she went

---

[1] Spicer uses the term "social history" in his petition. The affidavits in support of his claim tell of Spicer's character and childhood history. Therefore, throughout our discussion in this opinion we will refer to the term "character" and "childhood history."

2

over several times to tell Hebert of the phone call she received. Each time she went over to the trailer, Hebert's green Nissan truck was not there.

¶5. Around the time Mrs. Elder first began searching for Hebert, Deputy Sergeant Brian White of the Jackson County Sheriff's Department noticed a man driving a green Nissan truck in an unusual manner. The driver was later identified as Fred Spicer, and there was a female passenger in the truck named Angel Hinger. When the dispatcher informed Sergeant White that the license plate identified the car as registered to Edmond Hebert, Sergeant White asked the driver whether he was Hebert. The driver responded by saying, "I don't know who you are talking about."

¶6. White conducted an inventory search in the presence of Spicer before towing the truck, pursuant to Jackson County Sheriff's Department procedures. During the search, the officers discovered papers identifying Edmond Hebert as the registered owner of the vehicle. The officers also discovered a sword in plain view on the front seat and a camouflage jacket and drugs in the truck's toolbox.

¶7. The George County Sheriff's Department was contacted and a request was made to check on the welfare of Edmond Hebert. Together with Hebert's stepfather, James Elder, George County Deputy Sheriff John Hilburn went to Hebert's trailer. The trailer was locked, and there was no answer to their knocks on the door and windows. Elder then forced the door open and found Hebert's body dead on a couch, covered with blood from facial and head wounds. Blood spatters could be seen on the trailer walls, ceiling, floor, lampshades, and a table.

3

¶8.    Testimony regarding Hebert's autopsy revealed that Hebert suffered a large, abraded laceration measuring approximately three and one-half inches in length, extending across the forehead in a diagonal manner.  The edges of the laceration were scraped, and there were fractures to the skull itself.  Expert testimony also revealed that the injury to the forehead was fatal due to the fractures of the skull.  Hebert also suffered extensive bleeding around both eyes and had an abrasion of the skin covering his nose.  Hebert had traumatic injuries to his upper back as well as bruises, abrasions, and broken bones involving his right hand, which the expert identified as being consistent with a person trying to defend himself.  Hebert's death was determined to be a homicide.

¶9.    The large sword found in Spicer's possession while he was driving Hebert's truck belonged to Hebert and previously had been mounted on Hebert's wall.  Subsequent testing of blood stains on the sword revealed the genetic profile to be that of Hebert.  Additionally, the green camouflage jacket found in the truck's toolbox as well as the cargo pants and shirt worn by Spicer at the time of his detention also tested positive for blood that matched Hebert's genetic profile.

**ANALYSIS**

**GROUND I.  INEFFECTIVE ASSISTANCE OF COUNSEL.**

¶10.    The test for ineffective assistance of counsel is well-settled.  "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  ***Strickland v. Washington****,* 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To prevail on this claim, Spicer must demonstrate that

4

his counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Id.* at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984) (citing *Strickland*, 466 U.S. at 687).

¶11. Defense counsel is presumed competent. *Washington v. State*, 620 So. 2d 966 (Miss. 1993). However, even where professional error is shown, a reviewing court must determine whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991). When reviewing a case involving the death penalty, the most important inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695. If Spicer's post-conviction application fails on either of the *Strickland* prongs, the proceedings end. *Foster v. State*, 687 So. 2d 1124, 1129-30 (Miss. 1996).

I.    **Failure to investigate and present mitigation evidence during penalty phase of trial.**

      A.    **Character and Childhood History.**

¶12.  In *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L. Ed. 2d 471 (2003), the petitioner claimed that he had received ineffective assistance of counsel because his attorneys failed to investigate and present mitigating evidence at his sentencing. *Id.* at 521. Quoting

5

*Strickland*, the Court reiterated that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 521-22. In *Crawford v. State*, 867 So. 2d 196 (Miss. 2003), we relied on *Wiggins* and held that "a court is to determine whether counsel exercised reasonable professional judgment in conducting its investigation based on an assessment of the prevailing professional norms, including a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Id.* at 217 (internal quotations omitted).

¶13.    Spicer asserts that his trial counsel did not conduct any investigation into mitigating evidence regarding his "social history" in preparation for the sentencing phase of his trial. During the sentencing phase, the State introduced evidence of Spicer's prior convictions in the State of Rhode Island, where he was convicted on nine separate felony counts in three separate case numbers. Seven of the nine felony convictions were for violent crimes involving the use or threat of violence against a person. The violent crimes included two counts of robbery, two counts of kidnaping, two counts of assault with a dangerous weapon, and assault with intent to murder. Spicer served a total of eleven years in prison in Rhode Island.

¶14.    In mitigation, the defense called two witnesses. First, the defense called Spicer's mother, Bobbie Nell Spicer. The defense asked Mrs. Spicer a total of thirteen questions. Six of those questions sought to identify the witness, her address, and her relationship to the defendant, and to verify that she knew the circumstances for the trial. Two questions called for her personal opinion on whether Spicer should receive the death penalty. The State

6

objected to both of those questions, and the objections were sustained. The remaining five questions were directed at whether Spicer's mother knew her son had been in prison in Rhode Island for eleven years and whether Spicer had paid his debt to society for the past crimes.

¶15. The second witness called by the defense was Spicer's aunt, Regina Walters. The defense asked Ms. Walters a total of ten questions. Again, the first six questions sought to identify the witness, her address, and her relationship to Spicer. The next four questions established that Ms. Walters knew Spicer spent eleven years in prison and that he paid his debt to society on the previous convictions.

¶16. Spicer contends that if his defense counsel had investigated, they would have uncovered at least fifteen substantial witnesses who could have and would have provided mitigating evidence concerning Spicer. Spicer has provided affidavits from these potential witnesses. The substance of these statements reveals many pieces of possible mitigating evidence. "The law is now well established that the Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering, as a mitigating factor, any aspect of a defendant's character, record, or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *West v. State*, 519 So. 2d 418, 426 (Miss. 1988). It is for the trial court to determine what is relevant evidence of a defendant's character, prior record, or the circumstances of his offense. According to many of the affidavits, Spicer's counsel never attempted to contact these witnesses and they were willing to testify at Spicer's trial. Many of the affiants lived in George County. Two of the affiants, Spicer's mother and his Aunt Regina Walters, did testify, but were never questioned

7

about Spicer's childhood, education, drug habits, or other issues related to his character and childhood history.

¶17.     To prevail on this claim, however, Spicer must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Mohr*, 584 So. 2d at 430.

> An attorney may, of course, call less than all the character witnesses in mitigation. *See Stanley v. Zant*, 697 F.2d 955, 965 (11th Cir. 1983). There are many valid reasons for not calling witnesses: their testimony as a whole may be more harmful than helpful, their testimony may be impeached, their testimony may be cumulative, the witnesses may be unwilling or uncooperative; witnesses may be beyond the jurisdiction of the court or it may be beyond the financial ability of the defendant to provide for the witnesses' appearance.

*Leatherwood v. State*, 473 So. 2d 964, 969-970 (Miss. 1985) (footnote omitted).

> In view of the importance of mitigating evidence in the sentencing phase it is difficult to understand why favorable, willing witnesses who could be discovered by questioning the defendant would not be called. If it it [sic] were within the financial ability of the defendant to arrange for the appearance of a representative group of them, this would have a strong bearing on whether trial counsel provided effective assistance. Of course, counsel's overall performance must be considered.

*Id*. at 970.

¶18.     Based on the limited information before this Court at this time, it is difficult to ascertain trial counsel's reasons for not bringing some of these factors to the attention of the jury. We also note that both attorneys indicated a lack of information and notes in their files other than official pleadings. Spicer has raised minimally sufficient allegations to be entitled to a hearing concerning the effectiveness of his counsel during the penalty phase of his trial. However, showing that counsel was deficient is but one prong of *Strickland*. Showing

8

prejudice is a much harder task, and there is much needed information that this Court does not have before it. Therefore, we find that Spicer should be granted leave to proceed in the trial court in an evidentiary hearing, limited to Spicer's claim that his attorneys were ineffective for failing to investigate and present mitigating evidence of Spicer's character and childhood history at the penalty phase of Spicer's trial.

## B.     Adequate Mental Work-up.

¶19.   Spicer asserts that his attorneys were similarly ineffective in failing to present evidence of mental impairment as a mitigating factor at the penalty phase. As the State points out, on June 28, 2002, counsel filed a Motion for Determination of Defendant's Mental Competency. The motion was granted, and Spicer was sent to the Mississippi State Hospital at Whitfield, Mississippi. The summary report of the results from Spicer's forensic mental evaluation under the heading "Forensic Opinions" stated:

> We are unanimous in our opinion that Mr. Spicer has the sufficient present ability to consult with his attorney with a reasonable degree of rational understanding in the preparation of his defense, and that he has a rational as well as factual understanding of the nature and object of the legal proceedings against him.

> We are unanimous in our opinion that Mr. Spicer would have known the nature and quality of his alleged acts at the time of the alleged offense, and that he would have known at that time that those alleged acts would be wrong.

Under the heading "Discussion," the report further states:

> We are aware that Mr. Spicer has received mental health treatment in the past and that he is currently prescribed psychiatric medications for the diagnosis of schizophrenia. In our opinion, Mr. Spicer was not experiencing symptoms of any major mental disorder at the time of the alleged offense. Although, at the time of our evaluation, he appeared to be making a great effort to represent himself as having psychotic symptoms, limited intellectual abilities, and symptoms of amnesia, he did not seem to exhibit any credible symptoms of a

9

major mental disorder, he seems to be of at least low average intelligence, and he easily recalled details regarding his personal history. During our evaluation, he admitted to abusing several substances at the time of the alleged offense. It is our opinion that both his past behavior and his current mental state are best accounted for by the presence of a severe substance abuse disorder.

Mr. Spicer had no difficulty communicating with us during the evaluation interview. He should have no difficulty conferring rationally with his defense attorney, should he so choose.

¶20. Following the report, Spicer's attorneys filed a Motion for Further Examination to Determine Defendant's Mental Competency, which the trial court denied. Spicer's counsel were effective in seeking a mental evaluation of Spicer, and even attempted to acquire additional testing for their client. Some of the results from Spicer's evaluation arguably could amount to mitigating evidence, such as the acknowledgment by the doctors that Spicer previously had been diagnosed with schizophrenia. However, Spicer's mental evaluation revealed that Spicer was malingering. This issue will be more fully developed below during the discussion of Spicer's "Ground V."

¶21. There is a presumption that counsel's conduct is reasonable and professional and that decisions made are strategic. *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984). In the Addendum to Outpatient Evaluation Results of Psychological Testing, provided by the doctors at the Mississippi State Hospital, Spicer's doctors summarized him as:

. . . a 37-year-old, divorced, Caucasian man from George County charged with capital murder. Test results and clinical observations suggest that the defendant attempted to malinger memory and cognitive deficits on measures of memory, intelligence, achievement, and mental status, perhaps in an attempt to mitigate his legal problems.

10

This description of Spicer, if used by the State to rebut Spicer's claims of mental problems, could have been damaging in the eyes of the jury. Any decision not to use Spicer's mental evaluation in mitigation can be presumed strategic, and Spicer has failed to overcome that presumption.

## II. Failure to Conduct Any Investigation for Guilt Phase of Trial.

### A. Failure to Consult With Spicer.

¶22. Spicer contends that his attorneys did not consult with him prior to trial. He builds this argument on Hurt's time sheet/billing statement. Spicer asserts that Hurt spent only 63.25 hours on Spicer's case prior to trial and that "not one single hour was devoted to factual investigation or legal research." The State argues that relying on Hurt's billing records alone does not support Spicer's claim. Spicer had two attorneys. Barnett was Spicer's lead counsel during the trial. The State further argues that he was more likely to have been the attorney meeting with Spicer. Barnett was also the Public Defender for George County, and as a salaried public defender, Barnett would have no need to supply a billing statement to the trial court for payment. Spicer makes no assertion as to the number of hours Barnett spent on the case.

¶23. Additionally, it is apparent from the record that the defense had formed a strategy of self-defense as evidenced by much of the cross-examination of the State's witnesses and the jury instruction that the defense proffered. However, the strategy was undermined by Spicer's decision not to take the stand in his own defense, which undeniably is his right. The following dialogue took place at trial, outside the presence of the jury:

11

BY MR. HURT: May it please the Court, we have advised the defendant that it would be in his best interest to testify in this case in his defense in order to assert the defense of self-defense. However, the defendant has told us that he does not wish to testify in his behalf, which, under the Fifth Amendment of the Constitution of the United States, is his legal right.

We have also had him sign a document in the presence of the Circuit Clerk and Deputy Circuit Clerk, who is the bailiff, and also the Court Reporter, that we have advised him that it would be in his best interest to testify, and he has refused to do so. So, at this time, the defense rests.

. . . .

BY THE COURT: It is my duty, obviously, under these circumstances, Mr. Spicer, to – anytime an accused on trial for a felony offense decides not to take the witness stand and testify in his own defense, it's my duty as the judge to make sure this is a decision made of your own accord, voluntarily, after full consideration and consultation with your attorney. That's my job. Okay?

[SPICER]: Okay.

BY THE COURT: Now, Mr. Hurt has just told me that you have decided not to take the witness stand and testify during the guilt phase of this particular trial. Is that correct?

[SPICER]: Right.

BY THE COURT: Is what he said correct, that it is your decision not to testify?

[SPICER]: Yes, sir.

BY THE COURT: And I don't need to get into any communications, you know, what you have been advised and what you haven't or anything between you two, but are you satisfied you have been fully advised of different factors and given good advice in regard to whether to testify and whether not to testify?

[SPICER]: Yes. I understand completely.

BY THE COURT: Do you feel that you have enough information, you have been sufficiently counseled in order to be able to make that decision?

[SPICER]: Yes, sir.

BY THE COURT: Do you understand what I'm asking you?

[SPICER]: Um-hmm.

BY THE COURT: Are you satisfied with the advice you have been given?

[SPICER]: Yeah.

BY THE COURT: You need to say yes, sir or no, sir.

[SPICER]: Yes, sir.

¶24. The above dialogue is telling of two things. First, counsel did have a strategy in Spicer's case, which indicates that counsel had consulted with Spicer prior to trial in formulating a defense. Second, Spicer was satisfied with the advice of counsel. Spicer has not provided his own affidavit alleging that his attorneys did not consult with him, formulate a strategy, or investigate the events of the crime. Spicer's claim is without merit.

**B.    Failure to Conduct Factual Investigation.**

¶25. Next, Spicer contends that his attorneys failed to performed any factual investigation in preparation for trial. Spicer specifically relies on the affidavit provided by his attorneys. The two affidavits are identical, save the names, and each states:

> Pursuant to Mississippi Rule of Appellate Procedure 22(c)(4)(ii), I located my records related to Mr. Spicer's trial. My records include only publicly available pleadings and court records. My records do not now, nor did they ever include any notes, draft pleadings, correspondence, investigatory reports, attorney work-product, or other nonpublic information (collectively, 'Nonpublic Records').

¶26. Spicer asserts that the affidavits amount to an admission from each of his trial counsel that they performed no investigation at all. It is difficult to arrive at such a conclusion. Rule

22(c)(4)(ii) of the Mississippi Rules of Appellate Procedure requires Spicer's trial and appellate counsel to make available their complete files relating to the conviction and sentence. Paragraph 4 of each affidavit states: "If, in the future, I locate Nonpublic Records related to Mr. Spicer's Trial, I will immediately turn such records over to Mr. Spicer's post-conviction counsel, Skadden, Arps, Slate [,] Meagher & Flom[,] LLP, consistent with Mississippi Rule of Appellate Procedure 22 and the rules of professional conduct." It is a stretch to assume, let alone conclude, that Spicer's counsel did not investigate the alleged crime based solely on the aforementioned affidavits.

¶27.   Further, the transcript reveals that counsel were fully prepared for cross-examination of the State's witnesses, and were able to question the witnesses about details not brought out on direct examination. This claim is without merit.

1. *Failure to Examine Available Forensic Evidence.*

¶28.   This sub-claim contends that counsel were ineffective in not obtaining independent pathology and DNA experts to testify on Spicer's behalf. In support of this claim, Spicer provides the affidavit of Dr. O'Brian C. Smith, M.D., a pathologist from Tennessee, to support Spicer's claim that the sword was not the murder weapon. Dr. Smith went into great detail about wound patterns that he would have expected to find in an autopsy examination of the victim that he asserts were not present. Dr. Smith also admitted that he saw only pictures and drawings of the sword, not the sword itself.

¶29.   At trial, the State's expert, Dr. Steven Hayne, testified as follows:

> Q.   Have you had an ample opportunity to feel the weight of that particular sword?

A.     [Dr. Hayne]: Yes, sir.

Q.     And have you had an opportunity to notice the differences between the edges of that sword?

A.     Yes, Sir.

Q.     In reference to your testimony, to a reasonable degree of medical certainty, would any part of that sword be consistent with the injuries that you saw to facial area of Edmond Hebert?

A.     Yes, sir.

Q.     And would you describe to the ladies and gentlemen the injuries in Exhibit 27 and how they relate to Exhibit 4 [the sword].

A.     A weapon such as this delivered with force, striking the decedent on the non-sharpened edge, would produce injury such as that seen on the forehead of the decedent.

Q.     And is that entirely consistent with that edge?

A.     It would be consistent with the blunt end. But not consistent with the sharp edge.

Q.     The blunt edge of Exhibit 4?

A.     Yes, sir.

¶30.     Dr. Smith stated in his affidavit that no "indicia of sharp force injuries were present." He also stated that Hebert's death indisputably resulted from blunt force trauma to the head, particularly a "large abraded laceration." Dr. Smith did not refute Dr. Hayne's testimony. Spicer has not made a showing that his counsel was deficient.

¶31.     Spicer further contends that his counsel was ineffective in failing to rebut DNA evidence offered by the State. He contends that by consulting with an independent expert or even by interviewing the State's witness, Amrita Lal, counsel would have discovered

15

exculpatory evidence. The State's expert testified that the swabs taken from the blood on the sword were a mixture of more than one person's blood, but the victim's blood was included in that mixture. Spicer relies on Dr. Smith's affidavit, whereby Dr. Smith stated that blood of an unidentified third party is exculpatory evidence because that third party could have put the sword in the truck prior to Spicer driving the truck. First, the record does not indicate that the blood was from a "third" party. The expert testified only that there was a mixture of blood and Hebert's was included. Second, we fail to see how consulting an independent DNA expert would have helped Spicer, because he claimed self-defense. Spicer's counsel had no questions for the State's DNA expert, which we find is consistent with a self-defense strategy. This issue is without merit.

### 2. Failure to Interview Available Witnesses.

¶32. Spicer next contends that counsel were ineffective in failing to interview the prosecution's witnesses prior to trial. This claim appears to be an extension of Spicer's previous claim that his counsel failed to conduct a factual investigation. Spicer provided no affidavits from the officers who testified for the State, stating that they were not contacted or questioned by the defense. Also, as stated earlier, the record clearly shows that counsel was prepared for the witnesses during cross-examination. This issue is without merit.

### 3. Failure to Investigate Sources of Impeachment of Prosecution Witnesses.

¶33. Spicer claims that his counsel failed to investigate sources to impeach two of the State's witnesses. Spicer specifically refers to witnesses Michael "Chubby" Jones and Angel Hinger. Spicer asserts that counsel should have impeached their characters for veracity

16

because they were convicted felons. The record clearly shows that defense counsel brought the witnesses' convictions to the jury's attention. In both instances, counsel questioned the witnesses about the prison clothes they were wearing, and the jury was informed that they were in prison on felony charges. In closing, Hurt repeatedly called the jury's attention to the veracity of the two witnesses. Hurt argued:

And they haven't proved he stole the truck.

They brought two convicts in here. Two convicts. Now I don't know how reliable they are. I don't know, and you don't either, what they have been promised, if anything, to come up here and testify. But there's got to be some reason to haul one convict all the way from Pearl, Mississippi, and bring another one from Greene County down here. There's got to be some reason.

Are they reliable witnesses? Can we convict somebody of capital murder on people like that's testimony? Jailbirds? Are they credible? Is that the best witness they could come up with?

Looking further, Barnett's closing included the following argument:

Michael Jones. Boy he was a good witness for the State, wasn't he? A convict. Put him on the stand to use his testimony and they're going to put a man to death. Put him to death with a convict's testimony. You could look at him and tell the truth wasn't in him. He said they hadn't nobody talked to him until this morning. Maybe the DA's Office didn't talk to him, but I'll bet you – how did he know to come up here? Did he just volunteer on his own to come up here? I'll leave that to your thoughts. I'll leave that – I mean, y'all might have been born at night, but I don't believe you was born last night. Okay?

Spicer's claim that these witnesses were not properly impeached is without merit.

### 4. Failure to Investigate Available Strategies for Defense.

¶34. Spicer again questions trial counsel's investigation of the case and asserts that they did not have an appropriate strategy. It has already been mentioned that the defense strategy

17

of self-defense is apparent from the record. Further, the defense strategy included attacking the underlying offense of robbery. This issue is without merit.

## C. Failure to Adequately Defend Spicer.

¶35. Under this general assertion of counsel's failure to adequately defend him, Spicer raises numerous claims of ineffective assistance of counsel.

### 1. Failure to Object to the Insufficiency of the Indictment.

¶36. Spicer asserts that his attorneys were ineffective in failing to object to the sufficiency of the indictment because the indictment did not include a statutory aggravating factor nor a *mens rea* element. The underlying substantive claim was considered on direct appeal (*Spicer*, 921 So. 2d at 319), and it is now barred by the doctrine of *res judicata.* Miss. Code Ann. § 99-39-21(3) (Rev. 2007). This Court has held:

> The procedural bars of waiver, different theories, and *res judicata* and the exception thereto as defined in Miss. Code Ann. § 99-39-21(1-5) are applicable in death penalty PCR Applications. *Irving v. State*, 498 So. 2d 305 (Miss. 1986); *Evans v. State*, 485 So. 2d 276 (Miss. 1986). Rephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of *res judicata*. *Irving v. State*, 498 So. 2d 305 (Miss. 1986); *Rideout v. State*, 496 So. 2d 667 (Miss. 1986); *Gilliard v. State*, 446 So. 2d 590 (Miss. 1984). The Petitioner carries the burden of demonstrating that his claim is not procedurally barred. Miss. Code Ann. § 99-39-21(6) (Supp. 1991); *Cabello v. State*, 524 So. 2d 313, 320 (Miss. 1988). However, 'an alleged error should be reviewed, in spite of any procedural bar, only where the claim is so novel that it has not previously been litigated, or, perhaps, where an appellate court has suddenly reversed itself on an issue previously thought settled.' *Irving v. State*, 498 So. 2d 305, 311 (Miss. 1986).

*Lockett v. State*, 614 So. 2d 888, 893 (Miss. 1992).

¶37. Further, "[w]e must caution that other issues which were either presented through direct appeal or could have been presented on direct appeal or at trial are procedurally barred

18

and cannot be relitigated under the guise of poor representation by counsel." *Foster v. State*, 687 So. 2d 1124, 1129 (Miss. 1996).

*2. Failure to Object to the Improper Removal of Jurors for Cause.*

¶38. Spicer asserts that his counsel were ineffective in failing to object to the removal of jurors Creekmore and Peters. Despite counsel's failure to object at trial, this Court fully addressed the merits of this issue on direct appeal. *Spicer*, 921 So. 2d at 319-22. The underlying issue is procedurally barred*,* and it will not be considered again under the guise of ineffective assistance of counsel. *Foster*, 687 So. 2d at 1129.

*3. Trial Counsel's Waiver of Opening Statements.*

¶39. Spicer asserts that his counsel were ineffective in failing to provide the jury with an opening statement. "Opening statements are not mandatory. Miss. Code Ann. § 11-7-147. Failure to give an opening statement is not per se ineffective assistance of counsel. *Rushing v. State*, 711 So. 2d 450, 458 (Miss. 1998)." *Branch v. State*, 882 So. 2d 36, 55 (Miss. 2004). This Court has held that an attorney's failure to provide an opening statement is a matter of trial strategy. *See Rushing*, 711 So. 2d 458. Spicer's claim does not pass the standard set forth in *Strickland*, 446 U.S. at 687.

*4. Failure to Effectively Cross-examine Witness for Prosecution.*

> *a.    Trial Counsel Improperly Conducted Investigation during Cross-examination.*

¶40. Spicer contends that counsel was ineffective in bringing out favorable character evidence of the decedent during cross-examination of the victims's mother, Patricia Elder. He asserts that counsel failed to investigate prior to trial and waited until cross-examination

19

of Mrs. Elder to investigate. During questioning, Mrs. Elder testified that her son came to her house every morning for coffee. On direct appeal, this Court addressed Mrs. Elder's testimony on the merits and found that it was admissible, holding that such testimony did not amount to victim-impact testimony. *Spicer*, 921 So.2d at 307. This underlying issue is procedurally barred. Miss. Code Ann. § 99-39-21(2) (Rev. 2007). Notwithstanding this procedural bar and assuming, *arguendo*, that trial counsel was ineffective, Spicer cannot meet the second prong of **Strickland** by showing prejudice.

¶41. Spicer also contends that counsel should have investigated ahead of time whether Michael "Chubby" Jones, a convicted felon, had received anything from the State in exchange for his testimony. Jones testified that he received nothing in exchange for his testimony. Spicer's assertion assumes that counsel did not already know the answer to the question and was not merely putting skepticism in the jurors' heads. Spicer cannot show that this question was anything more than trial strategy, especially when defense counsel effectively broached the subject again in closing arguments and told the jury that Jones was a convict and questioned his truthfulness. This claim does not pass the standard set forth in **Strickland,** 466 U.S. at 687.

*b. Trial Counsel Failed to Point Out Weakness in Testimony.*

¶42. Spicer asserts that his trial counsel failed to point out weaknesses in the testimony of Carmen McIntire, the State's forensic toxicologist, who testified that no drugs, legal or illegal, were detected in Hebert's blood. He provides this Court with an article from the National Institute on Drug Abuse, which Spicer purports will show that fifty percent of methamphetamine is removed from a user's body within the first twelve hours. As the State

argues, this literature may be useful when determining drug levels in a living being. The toxicology screening in question at trial, however, was of Edmond Hebert, who was no longer living. This issue is without merit.

### c.    Trial Counsel Bolstered Testimony of Prosecution Witnesses.

¶43.    Spicer asserts that his counsel bolstered the testimony of the prosecution's witnesses by asking Patricia Elder, James Elder and Larry Beauchamp to reiterate that the State's Exhibit 4, the sword, belonged to the victim. As the State points out, defense counsel was asking these question to determine why the victim had so many swords and daggers and how these witness came to know that the swords and knives belonged to the victim. This issue is without merit.

¶44.    Next, Spicer takes issue with Dr. Hayne's testimony at trial that the victim "had a recorded age of 32 years" and that he "appeared the recorded age of 32 years." Spicer points out that the post-mortem report shows Edmond Hebert to have been 42 years old at the time of his death, as does the death certificate. Spicer also takes issue with Dr. Hayne's veracity regarding his testimony that he has performed more than 25,000 autopsies during his career. Spicer argues that counsel should have questioned Dr. Hayne about the number of autopsies he had performed and impeached him for misstating Hebert's age. Spicer offers no proof that Dr. Hayne was not truthful when testifying that he has performed more than 25,000 autopsies during his career. Spicer merely speculates that 25,000 is an unusually high number. As for Dr. Hayne's testimony that the victim was 32 years of age at the time of his death, rather than 42 years, Spicer assumes that this otherwise irrelevant fact would somehow impeach Dr.

21

Hayne as a witness. These claims do not pass the standard set forth in **Strickland,** 466 U.S. at 687.

¶45. Spicer next asserts that counsel was ineffective in agreeing with Dr. Hayne that the victim's wounds were defensive in nature. During cross-examination of Dr. Hayne by Hurt, the following dialogue occurred.

> Q. Let me ask you this then. Would the wounds that you described, other than the cause of death, the diagonal wound on the right forehead, would they not have been consistent with a fight between the parties?
>
> A. There are some injuries I cannot ascertain; I would favor that they are defensive. The presence of multiple fractures with the bones of the right hand and fingers, with concurrent injuries to the back of the right hand, the bruising, that is highly consistent with a defensive posturing injury.
>
> Q. Agreed.
>
> A. That would give evidence that that injury and, of course, the injuries to the face are consistent with defensive posturing injuries or purposely inflicted injuries. The superficial injury to the back of the right arm, I can't tell you what caused that. The superficial abrasion to the right back, I can't tell you that either.

¶46. It is Spicer's contention that this line of questioning by defense counsel was not only a concession that was inconsistent with counsel's predetermined self-defense theory, but also a breach of counsel's duty of loyalty to Spicer. The State argues that the context of the questioning reveals that counsel was agreeing with Dr. Hayne that there were some injuries the doctor could not ascertain. Defense counsel clearly was trying to point out that the victim may have had injuries that were consistent with Spicer's theory of the case. Because there were injuries that the doctor could not describe as defensive in nature, counsel agreed. Spicer's argument is without merit.

22

¶47. Finally, Spicer asserts that defense counsel was ineffective in going over blood spatters in Hebert's house with Officer Hillman. Spicer argues that counsel's cross-examination was an exhaustive reiteration of the location of every blood spatter in the victim's trailer. Spicer assumes that this line of questioning bolstered the testimony of the State's witness, and it may have. Spicer's attorney used this testimony to bolster the theory that blood spatters appeared throughout the trailer because a fight occurred between the defendant and the victim. During closing, Mr. Barnett stated:

> What did Al Hillman tell you sitting right there? He said blood was all over the trailer. And Mr. Hurt asked him, said, this far wall - - if I may, ladies and gentlemen, let me show you this. You come in here, it's real simple. Here is where the body was. There's blood over here. That could have been caused from just one lick, or two licks. But, it's 12 feet, according to Mr. Hillman, 12 feet over there, and blood is all over there.

This line of questioning can easily be seen as trial strategy considering defense counsel's closing argument regarding blood spatter.

### 5. Failure to Object to Character Evidence.

¶48. Spicer asserts that counsel were ineffective in failing to object to the introduction of a photograph of Edmond Hebert before his death. The substantive issue underlying this ineffective-assistance-of-counsel claim was fully discussed on direct appeal. *Spicer*, 921 So. 2d at 306-09. Because the underlying issue was held to have no merit, Spicer cannot show prejudice. This Court found the photo to be admissible, and this Court will not allow the issue to be re-argued under the guise of ineffective assistance of counsel. *Foster,* 687 So. 2d at 1129.

### 6. Failure to Object to Evidence of Flight.

23

¶49. Spicer asserts that counsel was ineffective for failing to object to the introduction of evidence of flight. The substantive issue underlying this ineffective-assistance-of-counsel claim was fully discussed on direct appeal. *Spicer*, 921 So. 2d at 304-06. Spicer is not entitled to any relief.

¶50. Spicer also contends that this Court's direct-appeal opinion was flawed. In other words, Spicer would have this Court reconsider its holding on the substantive issue. This Court held that the evidence of flight presented in this case was permissible. The issue is barred from reconsideration. Miss. Code Ann. § 99-39-21(3) (Rev. 2007).

### 7. Failure to Present a Case in Defense.

#### a. Abandoning Self-defense Strategy Mid-trial.

¶51. Spicer contends that his trial counsel were ineffective in "settl[ing] on a self-defense theory of the case early on, ignoring other possible strategies and failing to conduct any investigation into the facts whatsoever." Spicer basically complains that his counsel were ineffective because Spicer exercised his right to remain silent and Johnny Butler did not testify as they wanted. The State correctly points out that Spicer is wrong in both instances.

¶52. First, Spicer cites *Burns v. State*, 813 So. 2d 668 (Miss. 2001). In *Burns*, this Court granted leave for an evidentiary hearing on the issue of ineffective assistance of counsel for failure to present witnesses in mitigation, despite the defendant's acknowledgment during trial that it was his decision not to call witnesses. First, *Burns* is distinguishable because it considered counsel's failure to put on witnesses during the sentencing phase of trial. Further, in *Burns*,

24

[t]he State argues that the decision not to call any witness was made by Burns himself. The trial court questioned Burns outside the presence of the jury and he acknowledged that he understood that he had the right to testify and the right to call witnesses. He stated that it was his ultimate decision not to present any evidence in mitigation. *However, Burns has submitted an affidavit from one of his attorneys at trial who states that the lead attorney decided not to call any witnesses at the sentencing phase.*

(Emphasis added).

¶53. In the case *sub judice*, Spicer made the decision not to testify on his own behalf during the guilt phase, which was his right. Spicer acknowledged that it was his decision. In fact, an affidavit was presented to the trial court, signed by Spicer, acknowledging that his trial counsel advised him to take the stand. Spicer cannot now hold his attorneys responsible when it was his decision not to follow their advice.

¶54. As for Spicer's assertion that counsel was ineffective for not having any other witnesses, Spicer does not suggest who the other witnesses should have been or to what they would have testified other than to suggest that Johnny Butler should have been called to testify that he was going to fire Edmond Hebert and not Spicer. Spicer then asserts that the jury could have presumed that Hebert was angry. However, as the State points out, the record shows that the jury did hear from Butler on this point. During cross-examination by the defense, Butler testified as follows:

Q. [MR. BARNETT:]    Were they both good workers?

A.    Yes.

Q.    If you – do you recall ever making a statement to Mr. Spicer that he needed to get another way to work?

A.    I probably have, yes, sir.

25

Q.     What was the basis of that statement?

A.     I believe that for two weeks in a row there when I paid them, they were always late for work, and I just – you know, if he's got his own ride, he can't blame it on nobody else.

Q.     All right.  So, at that the [sic] point in time, you were thinking about firing Mr. Hebert; am I correct?

A.     You could possibly say that, yes, sir.

¶55.   Spicer has not shown his counsel to be deficient.  This claim cannot pass the standard in *Strickland*, 466 U.S. at 687.

> *b.  Failure to Offer Evidence Negating Underlying Felony of Robbery.*

¶56.   Spicer next avers that his trial counsel were ineffective in failing to rehabilitate the testimony of Jerry Woodward, in failing to investigate or subpoena witnesses who could have proved that Spicer did not steal Hebert's vehicle and in failing to "explore" James Elder's testimony.  As this Court stated on direct appeal, "[e]ven if the jury believed Spicer had permission to use the truck on previous occasions, it seems unlikely that he had permission here because Hebert was deceased." *Spicer*, 921 So. 2d at 314.  Further, evidence of permission to use Hebert's truck, which Spicer faults counsel for failing to procure, does nothing to prevent the jury from finding that Spicer robbed Hebert for the sword.  "There is evidence that [Spicer] stole the sword because he was in possession of it after Hebert's death and it had Hebert's blood on it." *Id.*   Spicer's claim does not pass the standard set forth in *Strickland*, 466 U.S. at 687.

> *8.  Failure to Secure Proper Jury Instructions.*

> *a.  Failure to Obtain a Lesser-included Offense Instruction.*

¶57. Spicer faults counsel for failing to obtain a lesser-included-offense instruction. Trial counsel did present the trial court with two proposed jury instructions on a lesser included offense, and they were rejected. *Spicer*, 921 So. 2d at 312-13. On appeal, this Court held that Spicer was not entitled to a lesser-included-offense jury instruction. *Id.* at 312-15. The underlying issue was addressed on the merits, and Spicer cannot show prejudice. Further, the underlying issue is now barred by *res judicata* and will not be reconsidered under the guise of ineffective assistance of counsel. *Foster*, 687 So. 2d at 1129.

> b. *Failure to Object to Instruction That Relieved State of Burden of Proving Every Element of the Offense.*

¶58. Spicer asserts that trial counsel were ineffective in failing to object to a jury instruction that, as he argues, improperly relieved the State of its burden of proving that Spicer had the intent to rob Hebert. This underlying substantive issue was raised on direct appeal, and this Court recognized that Spicer's counsel improperly preserved the objection at trial. *Spicer*, 921 So. 2d at 316. However, the procedural bar notwithstanding, this Court did address the issue on the merits and found that the jury was properly instructed. *Id*. Because this Court already has decided that Spicer was not prejudiced, he cannot pass *Strickland.* This issue is without merit.

> 9. *Failure to Object to Improper Aggravating Circumstances.*

¶59. Spice avers that his attorneys were ineffective in failing to object to the submission of the aggravating factor: "The capital offense was committed for pecuniary gain during the course of a robbery." He asserts that this was error because these two aggravating factors are separate aggravating circumstances and they cannot be submitted to the jury together.

27

He relies on ***Willie v. State,*** 585 So. 2d 660, 681 (Miss. 1991) and ***Jenkins v. State***, 607 So.

2d 1171, 1182 (Miss. 1992).

¶60.    The underlying, substantive issue was raised on direct appeal.  This Court noted that

counsel failed to object at trial and held the issue procedurally barred.  Notwithstanding the

procedural bar, this Court addressed the merits of the issue and rejected Spicer's reliance on

***Willie*** and ***Jenkins.  Spicer***, 921 So. 2d at 324.  This Court relied on ***Turner v. State***, 732 So.

2d 937 (Miss. 1999), wherein we dealt with an argument similar to Spicer's and upheld

Turner's conviction.

¶61.    As the State properly points out, this Court's most recent decision on this exact issue

can be found in ***Branch v. State,*** 882 So. 2d 36 (Miss. 2004), wherein this Court held:

> **XIV. The robbery and pecuniary gain.**
>
> ¶126.  In this assignment of error, Branch asserts that the trial court erred by
> instructing the jury that "The capital offense was committed for pecuniary gain
> during the course of a robbery." This, Branch contends, permitted the jury to
> give double weight to the motive for the robbery in reaching its penalty decision.
>
> ¶127. Not only is this issue procedurally barred for Branch's failure to raise
> this issue in the trial court, this issue is without merit. This exact instruction
> was found proper in ***Turner v. State***, 732 So. 2d 937, 954-55 (Miss. 1999). *See
> also **Irving  v.  State***, 618 So. 2d 58 (Miss. 1992). The argument that this
> instruction constitutes improper stacking has been rejected in numerous cases.
> ***Ladner v. State***, 584 So. 2d 743, 762-63 (Miss. 1991); ***Nixon v. State***, 533 So.
> 2d 1078, 1097 (Miss. 1987); ***Billiot v. State***, 454 So. 2d 445, 465 (Miss. 1984);
> ***Leatherwood v. State***, 435 So. 2d 645, 650 (Miss. 1983); ***Tokman v. State***,
> 435 So. 2d 664, 665 (Miss. 1983); ***Jones v. State***, 517 So. 2d 1295, 1300
> (Miss. 1987), *vacated on other grounds*, 487 U.S. 1230, 101 L. Ed. 2d 925,
> 108 S. Ct. 2891 (1988).

***Id.*** at 75.

¶62. Because the underlying issue has been found to be without merit, counsel cannot be held deficient for failing to object, nor can Spicer show prejudice.

## III. Trial Counsel's Failure to Object to Certain Alleged Instances of Prosecutorial Misconduct.

### A. Send-a-Message Argument.

¶63. Spicer argues that his counsel should have objected to the prosecutor's "send-a-message" argument during closing arguments of the guilt phase, and that the failure to object equates ineffective assistance of counsel. Spicer admits that this Court considered the substantive claim on direct appeal. This Court held that the "send-a-message" statements made to the jury by the prosecutor were error and noted that Spicer's trial counsel did not make a contemporaneous objection. Despite the arguable procedural bar, this Court discussed the merits of Spicer's claim and found the error to be harmless. *Spicer,* 921 So. 2d at 317-19.

¶64. Even assuming that trial counsel was deficient, this Court already has determined that Spicer was not prejudiced. Therefore, Spicer fails to meet the second prong of *Strickland*, 466 U.S. at 687.

### B. Failure to Object to Prosecutorial Misconduct During the Sentencing-Phase Closing Arguments.

¶65. Spicer asserts that his trial counsel failed to object to numerous remarks, which he alleges were improper, made by the prosecution during closing arguments at the sentencing phase of the trial. On direct appeal, this Court substantively addressed the comments now raised by Spicer, save one. We also note that some of them were objected to and some were not. As for the prosecutor's comments in closing that were substantively addressed on direct

29

appeal and determined to be free of error, they will not support Spicer's claim of ineffective assistance of counsel because he cannot show prejudice. Further, Spicer is precluded from relitigating the substantive issues under the guise of poor representation. *Foster*, 687 So. 2d at 1129.

¶66. The one issue raised by Spicer in the instant petition which was not addressed by this Court on direct appeal deals with trial counsel's failure to object to the prosecutor's comment that, if the jury did not vote for death, Spicer would have to be supported in jail "with our tax dollars." This Court stated in Spicer's direct appeal:

> ¶70. There is no distinction between the latitude given by this Court with regard to closing arguments during the sentencing phase as compared to the guilt phase. *Wells v. State*, 903 So.2d 739, 742-43 (Miss. 2005). Attorneys are afforded a wide latitude in arguing their case to the jury, but they are not allowed to employ tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury. *Sheppard v. State*, 777 So. 2d at 661. This Court will reverse a conviction because of lawyer misconduct if it concludes that the natural and probable effect of the improper argument was to create unjust prejudice against the accused and was likely to result in a decision influenced by the prejudice so created. *Id*. Furthermore, alleged improper prosecutorial comment must be considered in context with the circumstances of the case. *Ahmad v. State*, 603 So.2d 843, 846 (Miss. 1992). In this case, the Court must review the prosecutor's comments in conjunction with the "opening salvo" from defense counsel. *Edwards v. State*, 737 So.2d 275, 299 (Miss. 1999).

*Spicer v. State*, 921 So. 2d 292, 323 (Miss. 2006).

¶67. During the closing argument of the defense, counsel made a plea for the jury to have mercy on Spicer and to consider his age of 37. Defense counsel went on to say:

> If you give him life in prison without parole, I don't know what his life expectancy is, none of us know, that's up to the Lord, but however long it is, he'll be thinking about this every day and every night as to what he has done and what you convicted him of.

30

. . . He has spent most of his life in jail now, and it looks like–what I'm asking you to do is for him to spend the rest of it in there.

¶68. The prosecutor made the following comments, to which Spicer argues his counsel should have objected:

> He is either going to die in prison, which is a death penalty, and the State is going to support him forth the next 50 years until he dies, with our tax dollars, or he will die sooner. Either way, it's a death penalty. And I submit to you, why should he be allowed to sit for the next 50 years and watch TV and have friendships and to have associations and to have hope and to have all the things that living people have when Edmond Hebert is dead?

¶69. The decision to "make certain objections fall[s] within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim." *Powell v. State*, 806 So. 2d 1069, 1077 (Miss. 2001) (quoting *Cole v. State*, 666 So. 2d 767, 777 (Miss. 1995)). Even if we were to assume, for the sake of argument, that counsel was ineffective for failing to object to the State's comment, the natural and probable effect of the argument by the prosecution was not to create an unjust prejudice against Spicer resulting in a decision influenced by that prejudice. *See Howard v. State*, 945 So. 2d 326, 356 (Miss. 2006). Because Spicer cannot show prejudice, he cannot pass the standard set forth in *Strickland,* 466 U.S. at 687.

## IV. The Totality of the Circumstances and Ineffective Assistance of Counsel at the Guilt and Sentencing Phases.

¶70. Spicer asserts that the totality of the circumstances in this case warrants relief on the basis of ineffective assistance of counsel. As discussed in Spicer's Ground I., Issue I.A., Spicer is being granted leave to proceed in the trial court for an evidentiary hearing limited to his claim that trial counsel failed to investigate and present mitigating evidence pertaining

31

to Spicer's character and childhood history during the penalty phase. As for the cumulative effect of Spicer's remaining ineffective-assistance-of-counsel claims, they do not warrant relief.

**GROUND II. DUE PROCESS VIOLATIONS.**

### I. Spicer's Appearance Before the Jury Venire Wearing Shackles.

¶71. Spicer asserts that he was denied fundamental constitutional rights on the ground that he was brought before the jury venire in shackles. Before voir dire was conducted and while the potential jurors were seated in the courtroom, Spicer was led into the courtroom wearing civilian clothes with his hands and feet shackled. Theresa Ball, an officer with the Mississippi Department of Corrections, led Spicer into the courtroom through the back door behind the bench to the witness room, approximately three to six feet away, where she removed the shackles. The trial judge estimated that Spicer was in view of the potential jurors for only a few seconds. When Spicer's counsel moved for a mistrial based on an argument that potential jurors were prejudiced as a result of possibly seeing Spicer shackled, the trial judge denied Spicer's motion, finding that "this particular display was inadvertent" and "momentary."

¶72. This very issue was discussed and rejected by this Court on Spicer's direct appeal. *Spicer*, 921 So. 2d at 302-04. Spicer argues that "errors affecting fundamental constitutional rights may be excluded from procedural bars which would otherwise prohibit their consideration." *Smith v. State*, 922 So. 2d 43, 46 (Miss. 2006). However, this matter did receive consideration. Further, this Court has held that:

[T]he procedural bars of waiver, different theories, and *res judicata* and the exception thereto as defined in Miss. Code Ann. § 99-39-21(1-5) are applicable in death penalty PCR Applications. ***Irving v. State***, 498 So. 2d 305 (Miss. 1986); ***Evans v. State***, 485 So. 2d 276 (Miss. 1986). Rephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of *res judicata*. ***Irving v. State***, 498 So. 2d 305 (Miss. 1986); ***Rideout v. State***, 496 So. 2d 667 (Miss. 1986); ***Gilliard v. State***, 446 So. 2d 590 (Miss. 1984). The Petitioner carries the burden of demonstrating that his claim is not procedurally barred. Miss. Code Ann. § 99-39-21(6) (Supp. 1991); ***Cabello v. State***, 524 So. 2d 313, 320 (Miss. 1988). However, 'an alleged error should be reviewed, in spite of any procedural bar, only where the claim is so novel that it has not previously been litigated, or, perhaps, where an appellate court has suddenly reversed itself on an issue previously thought settled.' ***Irving v. State***, 498 So. 2d 305, 311 (Miss. 1986).

***Lockett v. State***, 614 So. 2d 888, 893 (Miss. 1992).

¶73. Like his direct appeal, Spicer again relies on ***Deck v. Missouri***, 544 U.S. 622 (2005). This Court considered his argument and rejected it. Spicer asserts that he has newly discovered evidence by way of an affidavit from Terrell Walters, Spicer's uncle, who stated in his affidavit:

> I was summoned to jury duty in connection with Fred's capital murder trial. On the first day I reported to jury duty, the judge asked the jury pool if anyone had a reason they felt they could not serve on the jury. I approached the judge and advised him that Fred is my nephew. The judge told me that this was not a good enough reason to be excused. Thereafter, I remained in the jury pool for two (2) days before being excused. While I was in the jury pool, I witnessed Fred being escorted into the courtroom in shackles. Fred was in plain view of the jury while he was shackled.

Spicer points to a sentence in the direct- appeal opinion wherein this Court stated: "However, Spicer presented no evidence that any of the jurors noticed the shackling." ***Spicer***, 921 So. 2d at 303. He submits that now he has done so.

¶74. First, the sentence in the direct-appeal opinion to which Spicer refers was detailing that Spicer's trial counsel presented no evidence on the matter to the trial court when Spicer

moved for a mistrial. In this Court's analysis of the present issue on direct appeal, we admitted that potential jurors may have seen Spicer: ". . . potential jurors possibly observed Spicer shackled in his brief walk of approximately six feet, from the back entrance of the courtroom to the witness room. That would not require a mistrial." *Id.* at 304. Second, Terrell Walters was not selected to sit on Spicer's jury, not that our decision should be any different if he had been.[2]

¶75. Spicer has not demonstrated a novel claim or a sudden reversal of law relative to these issues, which would exempt his claim from the procedural bar of *res judicata* pursuant to Miss. Code Ann. § 99-39-21(3) (Rev. 2007). *See also* **Lockett v. State**, 614 So. 2d 888 (Miss. 1992) (*citing* **Rideout v. State**, 496 So. 2d 667 (Miss. 1986); **Gilliard v. State**, 446 So. 2d 590 (Miss. 1984)).

## II.     Juror Misconduct.

¶76. Spicer asserts that during juror interviews, it was discovered that at least four jurors considered his silence at trial as indicative of guilt, despite the trial court's instruction that the jury must not consider the fact that Spicer did not testify as evidence of his guilt. In support of this assertion, Spicer offers the affidavit of his private investigator, John David Morledge, who asserted that he interviewed the jurors from Spicer's trial. Morledge stated in his affidavit that four named jurors considered Spicer's silence as a factor during

---

[2]The affidavit of John David Morledge, a private investigator retained to investigate matters for Spicer's Post-Conviction Relief, states that juror Manley Tisdale recalled witnessing Spicer in the courtroom wearing handcuffs while Tisdale was a member of the jury venire. Tisdale refused to sign an affidavit. Morledge's account in this regard amounts to hearsay. Hearsay notwithstanding, this Court, on direct appeal, considered the possibility that jurors may have seen Spicer in shackles.

34

deliberation, though none of those jurors would sign an affidavit. Morledge's affidavit amounts to nothing more than hearsay in this regard.

¶77. Even if one of the four jurors had provided his or her own affidavit, Rule 606(b) of the Mississippi Rules of Evidence provides that it would not have been admissible:

> (b) Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental process in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to beat upon any juror. *Nor may his affidavit or evidence of any statement by him concerning a matter about which would be precluded from testifying be received for these purposes.*

(Emphasis added). This issue is without merit.

**GROUND III. CUMULATIVE ERROR.**

¶78. Spicer asserts that each individual claim raised in this post-conviction-relief motion warrants relief and that the cumulative prejudicial effect requires reversal.

¶79. In ***Byrom v. State***, 863 So. 2d 836 (Miss. 2003), this Court held:

> What we wish to clarify here today is that upon appellate review of cases in which we find harmless error or any error which is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect. That having been said, for the reasons herein stated, we find that errors as may appear in the record before us in today's case, are individually harmless beyond a reasonable doubt, and when taken cumulatively, the effect of all errors committed during the trial did not deprive Michelle Byrom of a fundamentally fair and impartial trial. We thus affirm Byrom's conviction and sentence.

*Id.* at 846-47.

35

¶80.  Aside from the finding that Spicer should be granted leave to proceed in the trial court for an evidentiary hearing on the limited issue previously discussed, the record in this case supports no other finding of error on the part of his counsel or the trial court.  Therefore, Spicer was not prejudiced by a cumulative effect, and there was no adverse impact upon his constitutional right to fair trial.

**GROUND IV.  EXECUTION BY LETHAL INJECTION UNCONSTITUTIONAL.**

      **I.**       **Mississippi's Use of Three-Drug Protocol Amounts to Cruel and Unusual Punishment.**

              **A.**       **Mississippi Uses Three-drug Protocol.**

              **B.**       **Violation of Authorizing Statute.**

              **C.**       **Risk of Excessive Pain and Suffering.**

¶81.  It is Spicer's contention that execution by lethal injection constitutes cruel and unusual punishment.  This is the first time Spicer has raised this issue, and it was capable of being raised on direct appeal.  The issue is now procedurally barred from further consideration on collateral appeal.  Miss. Code Ann. § 99-39-21(1) (Rev. 2007).  In *Jordan v. State*, the petitioner failed to raise lethal injection as an Eighth Amendment claim and this Court employed the procedural bar.  *Jordan v. State*, 918 So. 2d 636, 661 (Miss. 2005).

> Jordan failed to make any claim relating to the method of execution at trial or on direct appeal.  Therefore, this claim is barred for consideration for the first time on application for leave to seek post-conviction relief. *See* Miss. Code Ann. § 99-39-21(1); *Bishop v. State*, 882 So. 2d 135, 149 (Miss. 2004); *Grayson v. State*, 879 So. 2d 1008, 1020 (Miss. 2004).

*Id.*

36

¶82. Notwithstanding the procedural bar, the ***Jordan*** Court looked to merits of the claim and found none based on Jordan's failure to submit any sworn proof as is required by Mississippi Code Annotated § 99-39-9(1)(e) (Rev. 2007). ***Id.*** at 662. Spicer also has failed to provide this Court with any affidavit which legitimately questions the lethal-injection protocol employed by the Mississippi Department of Corrections. This issue is without merit.

### D. Ineffective Assistance of Counsel for Failing to Challenge Execution by Lethal Injection in the Trial Court.

¶83. Spicer also asserts that his attorneys were ineffective in failing to argue in the trial court or on direct appeal that Mississippi's method of execution by lethal injection is unconstitutional. An ineffective-assistance-of-counsel claim requires this Court to analyze his counsel's actions pursuant to ***Strickland,*** 466 U.S. 668, and its progeny. Although we have held that the issue would properly be raised in the trial court or on direct appeal, that does not confer merit to the issue. To date, there has been no successful challenge to Mississippi's method of execution by lethal injection. Even if this Court assumes that Spicer's attorney was deficient for failing to raise the issue at trial or on direct appeal, Spicer cannot show that the outcome would have been different.

### II. Execution by Lethal Injection and First Amendment Rights.

¶84. Spicer contends that the use of pavulon, the second drug in Mississippi's lethal injection protocol, which is designed to paralyze the condemned, amounts to an unconstitutional prior restraint of speech. His argument is similar to his Eighth-Amendment argument in that he claims that, if the sodium pentothal, the first drug administered, is not

given correctly and he remains conscious while the third drug, potassium chloride, is administered, he could suffer great pain and be unable to speak out or otherwise express himself to his executioner. Therefore, Spicer submits that there is no legitimate justification for the restraint of his speech caused by the use of pavulon and that the restraint is over-broad because it does not provide an alternative avenue for expression.

¶85. Again, this issue was capable of being raised at trial or on direct appeal and now is procedurally barred from further consideration on collateral appeal. Miss. Code Ann. § 99-39-21(1) (Rev. 2007). *See also **Jordan**,* 918 So. 2d at 661.

¶86. Notwithstanding the procedural bar, the issue also is without merit. We look to our sister state of Florida. The Supreme Court of Florida considered this exact argument in ***Rolling v. State***, 944 So. 2d 176, 180 (Fla. 2006). In that case, Rolling asserted that the circuit court erred in denying an evidentiary hearing on his claim that the administration of pancuronium bromide violates his free speech rights as guaranteed by the First Amendment to the United States Constitution. ***Id.*** Rolling argued, specifically, that the administration of pancuronium bromide, which paralyzes the muscles, violated his right to free speech because it would render him unable to communicate feelings of pain that may result if the execution procedure is not performed properly. ***Id.*** The circuit court summarily denied Rolling's claim. On appeal, the Supreme Court of Florida ruled that because Rolling could not demonstrate that the chemicals involved in lethal injection would be administered improperly in his case, Rolling's argument was without merit and he was not entitled to any relief on his First Amendment claim. ***Id.*** See also ***Rutherford v. State***, 926 So. 2d 1100, 1114-15 (Fla. 2006).

¶87. Florida's *Rolling* case is on-point and persuasive. Spicer has provided no sworn testimony or affidavit to support his contention that the lethal-injection protocol will not be effective on him or that it will otherwise be improperly administered in his case. Spicer's claim is without merit.

**GROUND V. MENTAL RETARDATION.**

¶88. In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court determined that imposing the death penalty on mentally retarded inmates constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. *Id.* at 321. Two definitions of "mental retardation" were cited by the *Atkins* majority. The first was from the American Association on Mental Retardation (AAMR).

> Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.

*Id.* at 308, n.3 (citing Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed. 1992)). The second definition came from the American Psychiatric Association.

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.

*Id.* (citing Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed. 2000)).

¶89.   The *Atkins* court did not define who is or is not mentally retarded for purposes of eligibility for a death sentence but instead "leaves to the States the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Atkins*, 536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-17, 91 L. Ed. 2d 335, 106 S. Ct. 2595 (1986)).

¶90.   In *Chase v. State*, 873 So. 2d 1013, 1023 (Miss. 2004), this Court set forth specific requirements to be followed by the small number of persons with mental retardation claims convicted before *Atkins* and *Chase* were handed down.[3]

¶91.   This Court announced the requirements for obtaining a hearing to determine whether a capital defendant is mentally retarded as follows:

> With the sole exception discussed below, no defendant may be granted a hearing on the issue of Eighth Amendment protection from execution, due to alleged mental retardation unless, prior to the expiration of the deadline set by the trial court for filing motions, the defendant shall have filed with the trial court a motion, seeking such hearing. The defendant must attach to the motion an affidavit from at least one expert, qualified as described above, who opines, to a reasonable degree of certainty, that: (1) the defendant has a combined Intelligence Quotient ("IQ") of 75 or below, and; (2) in the opinion of the expert, there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded, as defined herein.
>
> Upon receiving such motion with attached affidavit, and any response filed by the State, the trial court shall provide a reasonable amount of time for testing the defendant for mental retardation. Thereafter, the trial court shall set a hearing on the motion, and the matter shall proceed.

*Chase,* 873 So. 2d at 1029. This Court further held:

---

[3]*Atkins* was decided on June 20, 2002, and *Chase* was decided on May 20, 2004. The date of Spicer's judgment was May 1, 2003, a little more than ten months after *Atkins* but more than one full year prior to *Chase*.

40

. . . that no defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that:

1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;

2. The defendant has completed the Minnesota Multiphasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

Such expert must be a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation.

Upon meeting this initial requirement to go forward, the defendant may present such other opinions and evidence as the trial court may allow pursuant to the Mississippi Rules of Evidence.

*Id.*

¶92.    Later, in *Lynch v. State*, 951 So. 2d 549 (Miss. 2007), this Court held that

. . . in Mississippi it is acceptable to utilize the MMPI-II and/or other similar tests. [*Chase*] at 1029. This Court did not intend by its holding to declare the MMPI-II or any one test as exclusively sufficient. Having a variety of tests at their disposal, courts are provided with a safeguard from possible manipulation of results and diminished accuracy which might result if courts are limited to one test. The United States Supreme Court mentioned the Wechsler Adult Intelligence Scales Test. See *Atkins*, 536 U.S. at 309 n.5. Other tests, as suggested by mental health experts, include the Structured Interview of Reported Symptoms (SIRS), the Validity Indicator Profile (VIP), and the Test of Memory Malingering (TOMM).

*Id.* at (¶ 23).

The Court's interpretation in this case as to the proper test to be administered with regard to an *Atkins* hearing supercedes any contrary decisions. This Court neither endorses the MMPI-II as the best test nor declares that it is a required test, and decisions that state otherwise are expressly overruled.

*Id.* at (¶ 24).

¶93.   To support his contention that he is mentally retarded and therefore constitutionally protected from execution, Spicer offers the affidavit of Dr. Marc L. Zimmerman, a forensic psychologist.  Dr. Zimmerman stated that he met with Spicer and conducted the Wechsler Adult Intelligence Scale III (WAIS III), Screening Tests for Luria-Nebraska Neurological Battery, Short Category Test, Benton Visual Retention test, Wide Range Achievement Test 3, and the "Minnesota Multiphasic Personality Inventory 2."  Dr. Zimmerman concluded from the test results that Spicer has a full-scale IQ of 75, that Spicer likely suffers from depression and probably bipolar disorder.  Dr. Zimmerman also stated that, based on his findings, he was able to conclude that Spicer functions in the mildly-retarded-to-borderline range of intellectual ability.

¶94.   What Dr. Zimmerman did not state in his affidavit, and which is required by ***Chase***, is whether or not Spicer was malingering.  This is disturbing because other medical reports evidence Spicer's history of malingering.  Specifically, the casenotes from the Mississippi State Hospital assessment of Spicer for the purpose of determining whether Spicer was competent to stand trial and assist in his defense, opined that Spicer was malingering.  In the Addendum to Outpatient Evaluation Results of Psychological Testing, under the heading "Malingering," the report stated:

> The M-Test is a brief measure designed to assess the presence of someone grossly feigning psychotic symptoms.  Mr. Spicer obtained a total score of 0, suggesting that he was not attempting to malinger unusual psychotic symptoms.  However, he did report more common symptoms, such as experiencing auditory hallucinations and feelings that other people are controlling him and his thoughts.  On the TOMM, a test designed to assess

42

feigned memory problems, Mr. Spicer earned scores suggesting that he was attempting to feign memory problems on the second trial of this instrument.

Further, under the heading "Summary," the doctors describe Spicer as follows:

Mr. Spicer is a 37-year-old, divorced, Caucasian man from George County charged with capital murder. Test results and clinical observations suggest that the defendant attempted to malinger memory and cognitive deficits on measures of memory, intelligence, achievement, and mental status, perhaps in an attempt to mitigate his legal problems. Additionally, he produced some incomplete and invalid test profiles, despite the evaluators prompting that he complete test measures. As a whole, the minimal effort he exerted towards genuinely answering test items raises questions regarding the validity of the results obtained from all of the tests administered. The defendant endorsed items suggesting that he meets criteria for a substance dependence disorder that is commensurate with his reported substance abuse history.

¶95. The doctors also noted that Spicer was given the MMPI-II and that he produced an invalid profile because he omitted seventy-five items on the instrument and refused to respond to the omitted items, despite prompting by the examiner. There are other notations by the doctors indicating that Spicer would not complete testing. Under the heading "Intellectual," on the same addendum report, the doctor wrote:

On the Shipley, a brief screening measure of intellectual functioning, [Spicer] obtained an invalid score, estimating a WAIS-R Full Scale IQ of 46 and placing him in the "Moderately Mentally Retarded" range of intelligence. Mr. Spicer's score was invalid due to his failure to complete this measure as he only attempted to respond to 13 of 60 items.

On the WRAT-3, a measure designed to assess academic achievement, [Spicer] obtained Reading, Spelling and Arithmetic standard scores below 45, placing him in the 1st grade and kindergarten levels. These scores are believed to be a gross underestimation of his current level of academic achievement, as he did not appear to put forth a genuine effort in correctly answering test items.

43

¶96. It is clear from Spicer's prior mental evaluation that he has a history of malingering, "perhaps in an attempt to mitigate his legal problems." Dr. Zimmerman's affidavit did not discuss whether Spicer was malingering and does not fulfill the requirements of *Chase*.

¶97. This Court's holding in *Chase* also requires that Dr. Zimmerman provide his opinion, to a reasonable degree of certainty, that Spicer is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or the American Psychiatric Association. Both of these definitions, as quoted above, take into consideration not only subaverage intellectual functioning, but also concurrent functional limitations in at least two of the listed adaptive skills. Dr. Zimmerman did not state in his affidavit that Spicer meets the definition of mentally retarded as defined by the American Association on Mental Retardation or the American Psychiatric Association. Dr. Zimmerman did not discuss Spicer's adaptive skills at all. In short, Spicer has failed to meet the requirements set forth by this Court in *Chase*.

## CONCLUSION

¶98. The majority of the claims raised by Spicer are barred from consideration or are without merit. However, the Court finds that Spicer has made a sufficient showing on his claim of ineffective assistance of counsel at the sentencing phase of his trial to be entitled to an evidentiary hearing in the trial court. The Court finds that Spicer's Petition for Post-Conviction Relief will be granted and that Spicer will be allowed to proceed in the trial court in an evidentiary hearing limited only to Spicer's claim that his trial counsel failed to investigate and present mitigation evidence of Spicer's character and childhood history during the penalty phase of his trial. All other claims for relief are denied.

44

¶99.   **PETITION FOR POST-CONVICTION RELIEF IS GRANTED IN PART AND DENIED IN PART.**

**SMITH, C.J., WALLER AND DIAZ, P.JJ., CARLSON, JJ., DICKINSON AND RANDOLPH, JJ., CONCUR.   GRAVES, J., CONCURS IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**